IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 13, 2015 Session


**STATE OF TENNESSEE v. FREDDIE LEE JOHNSON**


**Appeal from the Criminal Court for Davidson County**
**No. 2012-D-3548     Mark J. Fishburn, Judge**

_____


**No. M2014-01494-CCA-R3-CD – Filed September 10, 2015**

_____


The Defendant, Freddie Lee Johnson, appeals his conviction for first degree felony murder, arguing:  (1) the State failed to establish a sufficient chain of custody for a latent fingerprint lifted from the crime scene; (2) the Defendant's right to confrontation was violated when the trial court allowed testimony that the Defendant's fingerprint was lifted from an area in the crime scene that "raised a red flag"; (3) the Defendant's right to present a defense was violated when the trial court prohibited trial counsel from arguing an alternative location for the Defendant's fingerprint; (4) the trial court erred by failing to grant a mistrial when a witness testified that the latent print was lifted from a cup; (5) the trial court erred by refusing to dismiss the indictment pursuant to State v. Ferguson; (6) the trial court erred by allowing the victim's daughter to testify about comments made by the victim about the Defendant; (7) the trial court violated the Defendant's right to present a defense by refusing to allow the defense to introduce a prior statement from an unavailable witness; (8) the State committed prosecutorial misconduct in closing argument; (9) the trial court erred in its instruction to the jury on flight; (10) the trial court erred by allowing the State to introduce into evidence portions of the Defendant's police interview; and (11) the trial court erred by ruling that the State could use the Defendant's prior theft convictions for impeachment.  Following a careful review of the record and applicable law, we affirm the Defendant's convictions but remand for correction of the judgments.


**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed;**
**Case Remanded**


ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Kevin McGee, Nashville, Tennessee, for the appellant, Freddie Lee Johnson.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Victor S. Johnson, III, District Attorney General; and Rob McGuire and Sarah Davis, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

This appeal involves the murder of 72-year-old Ethyl Pearl Hethcote whose body was discovered in the bathtub of her Nashville home on January 29, 1979. Several suspects were investigated by the Metropolitan Nashville Police Department ("MNPD") in 1979, but no arrests were made in connection with the victim's death until February 2012, when the Davidson County Grand Jury indicted the Defendant for first degree premeditated murder. The Defendant's indictment came about after MNPD's cold case unit matched a fingerprint found on a coffee cup at the crime scene to the Defendant. Following the Defendant's indictment, an inmate at the county jail came forward and informed investigators that the Defendant admitted killing the victim. In December 2012, the grand jury issued a superseding indictment, charging the Defendant with first degree premeditated murder in count one and first degree felony murder committed during a larceny in count two.

*Ferguson Hearings*

The Defendant moved to dismiss the superseding indictment pursuant to State v. Ferguson, 2 S.W.3d 912 (Tenn. 1999), alleging that the coffee cup from which the Defendant's latent print was taken had been lost, along with the liquid that had been collected from inside the coffee cup. At a series of hearings on the Defendant's motion to dismiss, retired MNPD detective, William Flowers, testified that the victim was murdered on January 29, 1979, but he did not become involved in the investigation until February 16, 1979, when he took some items of evidence from the police department's property room and transported them to the crime lab for analysis. The transported items included, among other things, a piece of blood-stained carpet and a glass jar that contained the liquid contents of a coffee cup found at the crime scene. Detective Flowers explained that the contents of the coffee cup were collected because there was "some doubt as to whose cup it was and the victim was known not to use sugar in her coffee. Therefore, we sent what was left in the cup to the lab to be analyzed, to see if there was in fact sugar." According to Detective Flowers, the crime lab determined that the liquid contained sugar, which indicated to investigators that the coffee had not been the victim's. Detective Flowers stated that it was the belief of the detectives in 1979 that

- 2 -

whoever had been drinking from the coffee cup had killed the victim. He testified that he did not know why the coffee cup itself was not collected.

On February 17, 1979, Detective Flowers attempted to interview the Defendant, who was on parole at the time. Detective Flowers could not locate the Defendant at any of his known addresses. On March 8, 1979, Detective Flowers learned that the Defendant was in custody on new charges of armed robbery and rape out of Memphis. Detective Flowers then obtained a set of the Defendant's fingerprints from the Tennessee Department of Correction and provided it to MNPD's identification ("ID") division.

Sergeant Pat Postiglione testified that he was a homicide investigator with MNPD and was in charge of investigating "cold cases," including the case against the Defendant. Sergeant Postiglione explained that there was physical evidence linking the Defendant to the crime scene—specifically, a fingerprint on a coffee cup that was located inside the area of the crime scene. Officer Don Monday, who was with the department's ID division in 1979 but had since died, lifted the latent print. Officer Monday's crime scene report specifically stated that he "[d]usted coffee cup in hallway and obtained partial latent." Additionally, Officer Monday wrote on the latent lift card that he lifted the print from a "coffee cup" found on "top of clothes hamper [in the] hallway." On October 17, 1979, the latent fingerprint was examined and compared to the Defendant's prints. At that time, the examiner said there were not enough points of comparison to make a match. Sergeant Postiglione testified that he was not aware of any other identifiable latent fingerprints lifted by Officer Monday.

Sergeant Postiglione noted that the property tag filled out by Officer Monday did not list the coffee cup as having been collected. Rather, it read, "1 jar-contents of cup of coffee." He testified that it would not have been unusual in 1979 for Officer Monday to have not collected the coffee cup after he lifted the latent print.

Sergeant Postiglione identified a copy of the handwritten, police evidence log from 1979 that listed the items of evidence turned in by Officer Monday. The evidence log listed "1-mug" or possibly, "1-rug." Sergeant Postiglione noted that the jar of liquid contents had been left off the handwritten evidence log in 1979. He did not know who filled out the log but testified that the handwriting did not belong to Officer Monday.

Sergeant Postiglione acknowledged that a printed receipt from the property room indicated that the box of evidence from the scene contained, among other things, "one coffee mug." He explained, however, that the typed portion of the receipt had been generated by the property room computer when Sergeant Postiglione took the box of evidence from the property room to the Tennessee Bureau of Investigation ("TBI") crime lab in October 2011. He stated that the typed information on the receipt had been entered

into the computer in 1995, when the department transferred their handwritten police evidence logs to computer. Sergeant Postiglione testified that he did not open the box to verify its contents before he signed the computer generated property receipt that indicated the presence of a coffee cup. The box of evidence was opened once Sergeant Postiglione delivered it to the TBI. The TBI examiner assigned to test the items for DNA notified Sergeant Postiglione that the box of evidence no longer contained the "jar with [liquid] contents," which had been tested for the presence of sugar in 1979. Despite an intensive search of the police department's property room, the jar and liquid sample could not be found and was, therefore, not available for DNA testing.

Detective Ralph Langston testified that he worked as a homicide detective in 1979 and responded to the crime scene on the day of the victim's murder. Two other detectives were already at the scene—Detective John Brown and Detective Terry McElroy. Although Detective Brown initially assessed the scene as a natural death, Detective Langston did not agree that the victim had died of natural causes, and he had the scene worked as a homicide. In a walk-through of the victim's home, Detective Langston noticed a clothes hamper in the hallway with a blouse and coffee cup sitting on top of it. He immediately went into the kitchen and talked with the victim's daughter about whether the victim would have had a cup of coffee in that location. From the victim's daughter, Detective Langston learned that the victim did not leave things lying around and would not have left a coffee cup on the clothes hamper.

Detective Langston then instructed Officer Monday to photograph the coffee cup, dust it for fingerprints, and collect the fluid present inside the cup. Detective Langston testified that he did not request that Officer Monday collect the coffee cup itself, and he believed that Officer Monday put the contents of the coffee cup into a jar. Although Detective Langston did not watch Officer Monday actually lift the print from the coffee cup, he later saw the latent lift card onto which the print had been placed. Detective Langston acknowledged that several detectives were giving Officer Monday directions on processing the scene, which was unusual.

Detective Langston acknowledged on cross-examination that one of his supplemental reports failed to mention the coffee cup. However, he recalled that he had mentioned requesting the coffee cup to be dusted for prints in one of his later reports. When asked about the location of this later report, Detective Langston responded, "I have no idea about where the reports are 39 years later or anything to do with that. I made note of the coffee cup, I had it photographed, I had it fingerprinted and the substance taken as evidence to be tested, that's what I did." Detective Langston noted that a report from Detective Flowers dated February 17, 1979, stated that Detective Flowers submitted the "partial print lifted from coffee cup" to see if the latent print was suitable for comparison.

Dr. Laura Boos, with the TBI crime lab, testified that she tested various items of evidence for the presence of DNA in 2011. She explained that the DNA obtained from the evidence was from a female source. Dr. Boos stated that she did not receive liquid contents of the coffee cup for testing but, if she had, she would not expect to find a useable DNA profile from the liquid inside of a cup. Dr. Boos explained that, if she had the coffee cup itself, she could have tested it for DNA by swabbing the rim of the cup for skins and saliva cells. Dr. Boos testified that, from her standpoint as a DNA analyst, the coffee cup would have been the important item to test for DNA, not the liquid contents of the container. In fact, liquid contents of a drinking vessel would be an "atypical submission" and would not normally be tested for DNA by her lab. Dr. Boos explained that this was "just not a good source of DNA" and that she would not expect there to be enough DNA transferred into the liquid from the "normal drinking process" for testing.

Following the pretrial hearings, the trial court issued a memorandum opinion denying the Defendant's motion to dismiss the indictment pursuant to Ferguson. The trial court found that the coffee cup was not collected as evidence by investigators. Moreover, the court concluded that the coffee cup itself was of "questionable value," noting that the significance of the cup was the latent print it contained and that the print was recovered and preserved. The trial court determined that the Defendant would not have been entitled to relief under Ferguson even if the coffee cup had been collected and lost. Regarding the liquid contents of the coffee cup, the trial court found that the liquid had been collected and placed in a jar and was admittedly lost. Nonetheless, the trial court determined that the probative value of the liquid contents was "not of great import" and that any potential DNA testing of the liquid sample would not diminish the critical evidence against the Defendant—his fingerprint on the coffee cup and his admissions to two jail inmates.[1]

*Chain of Custody Hearing*

The Defendant also filed a motion to prohibit the State from introducing any evidence or testimony relating to the latent fingerprint lifted from the crime scene and the liquid sample collected from the coffee cup, arguing that the State could not sufficiently establish chain of custody. At a hearing on the motion, the State introduced a copy of the latent lift card and the envelope that contained the latent lift card. The Defendant entered Officer Monday's crime scene report into evidence.

---

[1] At a bond hearing held following the issuance of the first indictment, Sergeant Postiglione testified that two inmates in jail with the Defendant, John Williams and Marquale Burke, had come forward with a confession from the Defendant that he had killed the victim.

On March 11, 2013, the trial court issued an order, in which it found that the State could "establish with reasonable assurance that the fingerprint is identifiable to a specific person, that it was lifted from the crime scene on January 29, 1979, and that it is not the type of evidence easily . . . susceptible to contamination, alteration, or [that it is] anything other than what it is purported to be." However, the court recognized that "[w]hat appears to be missing here is anyone who, with personal knowledge, can say from what object the print was lifted." The court stated that the item from which the print was lifted could only be established through "inadmissible hearsay evidence" and that, even if this hearsay evidence was reliable, the Defendant would be unable to "cross examine anyone with personal knowledge about this fact." As such, the trial court ruled that the fingerprint was admissible "as having been collected at the residence on the day in question and . . . lifted in the general area in which [Officer] Monday was directed to dust for prints[.]"

On March 18, 2013, the trial court issued a second order further addressing the admissibility of testimony about the location from which the latent print was lifted. The trial court ruled that Sergeant Postiglione could not testify that he had information indicating that the print was lifted from the cup because that information was based upon inadmissible hearsay and was "testimonial evidence of an unavailable witness not subject to cross-examination." Nonetheless, the trial court recognized that the State's inability to inform the jury that the fingerprint was lifted from the coffee cup could raise questions about why Sergeant Postiglione identified the Defendant as a suspect and allow the Defendant to "mislead the jury on the significance of the print." Therefore, the trial court ruled:

> Sergeant Postiglione can testify that he is aware of only one documented print being recovered from the relevant crime scene (bedroom, bathroom, hall), the print was recovered from an area within the crime scene that raised a red flag needing to be investigated further to confirm or dispel any concerns that he had about the existence of the print, and that nothing in the original investigation or his own investigation, including the interviews of the [D]efendant, provided any reasonable explanation for why the print would otherwise be there.

The trial court further ruled that the Defendant was prohibited from arguing to the jury that the fingerprint was found elsewhere, stating:

> [T]he defense cannot argue any position to the jury that calls upon them to speculate, is not otherwise fairly raised by the evidence, or is a known falsehood. The court is not attempting to unfairly limit any defense the Defendant may wish to put forth, however, the court cannot condone an

argument that is misleading or creates a false impression of an otherwise reliable fact.

*Additional Pre-trial Rulings*

Prior to trial, the State filed a Notice of Intent to Use Convictions, detailing the Defendant's prior convictions, including convictions for robbery, theft, and evading arrest, that it intended to use as impeachment evidence at trial. In response, the Defendant filed a Motion to Prohibit the State from Impeaching the Defendant with Prior Convictions, in which the Defendant alleged that "any impeachment" based upon his prior convictions "would be unfairly prejudicial" to the Defendant. At a subsequent hearing, the Defendant specifically objected to the State's use of his convictions for evading arrest and robbery. He asserted that the impact of the robbery conviction would be highly prejudicial due to the similarity between the crime of robbery and the crime of larceny underlying the Defendant's felony murder charge. The trial court stated that it would consider the robbery conviction further. The trial court also commented, "[B]ut certainly the thefts are admissible, although the indictment actually charges theft, doesn't it?" Counsel for the Defendant responded that the indictment charged larceny, "[w]hich is theft." The trial court then responded that the "credibility issue on those . . . significantly outweighs the fact that [larceny is] an underlying felony."

The Defendant also filed a motion to prohibit the State from eliciting hearsay statements of the victim, claiming that such testimony would violate the Defendant's rights to confrontation and due process. At a hearing on the motion, the victim's daughter, Linda Crossland, testified that, in early January 1979, the victim hired an insulation company, Thermo Foam, to install insulation in the attic of her residence. Although Ms. Crossland was not home at the time of the installation, the victim was at the house while the crew from Thermo Foam worked on the attic. After the work was completed, Ms. Crossland had a conversation with the victim about one of the workers. The victim remarked that a young black man had been on the work crew and that she felt sorry for him. This man, whom the victim referred to as "Mr. Freddie," was the only person from the work crew about whom the victim talked. The victim did not mention that she was going to try to help Mr. Freddie, but the victim told Ms. Crossland that Mr. Freddie had a hard life and he "deserved a break in life." Ms. Crossland recalled that this conversation with her mother took place "within a few weeks" of the victim's murder. On cross-examination, Ms. Crossland stated that the victim felt sorry for Mr. Freddie and explained that the victim was "a very devote[d] Christian. She was very open and friendly with people. Tenderhearted."

Following this testimony, the trial court ruled that Ms. Crossland's testimony about her conversation with the victim was admissible as an exception to the hearsay rule

- 7 -

as a statement of the victim's then existing mental or emotional condition. The court found that the conversation took place within the timeframe of the homicide and clearly established the victim's existing mental or emotional state. The trial court reasoned:

> The fact that [the victim] had made these observations, while she may not have directly to her daughter suggested that she was going to do anything for Mr. Johnson, the fact that she made these observations clearly indicates that she had had friendly-type conversations with [the Defendant], otherwise she wouldn't have been able to make the observations that he had had a hard life, and those are reasons that le[]d her to believe that he needed a break in life[.]

The court found that the statements were "particularly relevant" because there was no evidence of forced entry into the house and that these statements "circumstantially could explain that particular situation."

*Trial*

At the Defendant's subsequent trial, Lynda Crossland testified that, in January 1979, she lived in a house on Radford Drive with her elderly mother, the victim, and daughter, Missy.[2] Ms. Crossland worked every weekday, from 8:00 a.m. to 5:00 p.m., at McDowell Enterprises as an account supervisor. The victim was retired and stayed home during the day while Missy attended Glencliff Middle School. Ms. Crossland testified that her mother's routine was the same every weekday. The victim would get up and get dressed for the day, make coffee, and then wake up Ms. Crossland and Missy. Ms. Crossland would have a cup of coffee or tea in the kitchen with her mother, and the victim would eat a bowl of Special K cereal. After Missy would leave the house to catch the school bus, the victim would drive Ms. Crossland to work between 7:30 a.m. and 8:00 a.m. because they only had one car. After taking Ms. Crossland to work, the victim would return home and make toast in the oven before a talk show came on at 9:00 a.m. On a normal weekday, the victim would pick up Ms. Crossland from work at noon, and they would return to the house for an hour lunch break. Then, the victim would pick up Ms. Crossland from work at 5:00 p.m.

According to Ms. Crossland, the victim took a bath at night; she would not take a bath during the day unless she had been working out in the garden in the summertime. The victim usually did light housekeeping and laundry during the day. While the victim may have left an interior door leading into the garage unlocked if she was doing laundry,

---

[2] We have addressed Missy by her first name because Missy's surname is unclear from the record. We intend no disrespect.

she always locked the doors to the outside of the house when she was at home alone, and the victim would only go outside to take their dog out. Ms. Crossland explained that her mother kept the house very clean and would not leave dishes sitting around or her clothes strewn about the house.

In early January 1979, several weeks prior to her mother's murder, Ms. Crossland and the victim hired a company called Thermo Foam to install insulation in the attic of their home and caulk windows. Although Ms. Crossland was at work when the insulation was installed, the victim was at home with the workers. The victim talked to Ms. Crossland several times about one worker in particular, a black man whom she referred to as "Mr. Freddie." The victim told her daughter that "[s]he felt sorry for [Mr. Freddie]; he had had a hard life; she wished she could help him, but she couldn't . . . except listen to him." Ms. Crossland explained that it would not be unusual for the victim to offer the workers coffee in the morning. The work crew came out to the home several times, and at one point, the victim had become frustrated that it took multiple visits before the job was finished.

Ms. Crossland recalled that she and the victim had coffee in the morning on the day of the murder. The victim wanted to stop by a grocery store later that day, so Ms. Crossland gave her nine dollars, which the victim put into her wallet. Ms. Crossland spoke to her mother on the phone around 8:00 a.m., confirming that the victim arrived back at home after dropping off Ms. Crossland at work. Later that day, Ms. Crossland attempted to call the victim several times but kept getting a busy signal. Eventually, Ms. Crossland called the telephone company and reported that the phone was out of order. Before lunchtime, Missy called Ms. Crossland and said she had also been trying to call the victim at home to ask permission to stay after school for a basketball game. At lunchtime, the victim failed to pick up Ms. Crossland. Thereafter, a telephone repairman called Ms. Crossland from the telephone pole outside her home. He told her that he could hear a dog barking and the television on inside the house. Alarmed, Ms. Crossland immediately asked a friend at work to drive her home.

When she arrived home, Ms. Crossland entered the residence with the telephone repairman. There were no signs of forced entry, but Ms. Crossland noticed that the family dog was inside the garage, which was unusual. The dog was usually kept inside the house with her mother. As she walked further into the house, Ms. Crossland noticed blood on the carpet in her bedroom by an exercise bike, and the phone in her room was off the hook. When she entered the bathroom, Ms. Crossland saw blood on the bathroom rug in front of the bathtub. Her mother was submerged in water in the bathtub with her head under the faucet. It was obvious to Ms. Crossland that the victim was deceased.

Ms. Crossland testified that she went into shock, and the next thing she remembered was sitting at her kitchen table with paramedics talking to her. Ms. Crossland later walked through the house with Sergeant Touchstone pointing out things that were out of place. Ms. Crossland noticed a coffee cup sitting on top of the dirty clothes hamper in the hallway along with her mother's blouse and "immediately told him that was not [her] mother's coffee mug." Ms. Crossland explained that the victim owned a set of four white coffee mugs with different floral patterns on the side. The victim's coffee cup had daisies on it, and she was the only person to use that cup. The victim did not use the coffee cup that was found on top of the hamper. Moreover, the coffee cup was not there when Ms. Crossland left for work that morning.

Ms. Crossland also stated that the blouse lying on top of the hamper should not have been there. If the victim had intended to change clothes, she would have laid her clothes out on her bed. If her clothes were dirty, she would have put them inside the hamper. She pointed out other items that were out of place inside the house, including the victim's glasses that were on the floor of Ms. Crossland's room. Ms. Crossland further explained that her mother would not normally leave her pants and underwear as they were found—pulled inside out and lying on the bed. Moreover, her mother never had problems unbuttoning shirts.

In the kitchen, Ms. Crossland noticed that the victim's toast was still in the oven, but the oven had been turned off. Ms. Crossland saw the victim's purse open on the kitchen table and the wallet lying beside it. The nine dollars in cash she had given her mother was missing. Additionally, a ring that the victim wore all of the time was missing. The ring had a ruby center with four other birthstones surrounding it, representing the victim's children. Ms. Crossland also discovered that a Timex watch that her mother kept on the top of her chest of drawers was missing. Detectives later contacted pawn shops about the ring, but it was never found.

Ms. Crossland did not see any windows that were damaged or broken around the home. She explained that the windows consisted of an inside window with a lock at the top and then, on the outside, double-paned storm windows with double locks. She stated that "[t]he only way to get those storm windows open was if you break it, break the glass" and that there would have been no way for a person on the outside of the house to enter through a window undetected. Regarding the doors of the residence, Ms. Crossland testified that the only door which potentially could have been unlocked was the interior door leading from the garage to the kitchen. The garage door was closed, however, and her mother's car was parked in the driveway outside the garage. Ms. Crossland testified that she had no reason to believe that anyone from Thermo Foam would have been coming to the house that morning. The company had completed the insulation work in mid-January, and no one from Thermo Foam had been at the house for weeks.

Detective Ralph Langston testified that he began working for MNPD in 1971 and was a supervisor in the homicide division at the time of his retirement in 1994. Detective Langston recalled that, on January 29, 1979, he responded to a "death call" at the victim's residence on Radford Avenue with his shift supervisor, Sergeant Barry Touchstone. Detective Raymond Brown,[3] Detective Terry McElroy, and other officers were already on the scene by the time Detective Langston arrived. Officer Don Monday, with MNPD's ID division, was already in the process of photographing the scene. Detective Brown, who was initially assigned the case, believed that the death may have been accidental and brought on by some natural phenomenon.

Detective Langston did a walk-through of the crime scene. The victim was lying in the bathtub, and there appeared to be blood and bruising on the victim's face and discoloration in the water from blood. The victim had a bra looped around her neck. Detective Langston also noticed blood on the toilet and a button on the rug. In the hallway outside the bathroom, Detective Langston observed a clothes hamper that had a multi-colored, flowered shirt and a coffee cup on top of the hamper. The shirt had blood stains on it and was missing more than one button. In one of the bedrooms, he saw a pair of pants and ladies' panties that had been turned inside-out and left on the bed. In the other bedroom, Detective Langston noticed a pair of glasses and blood on the carpet at the base of a stationary bike.

After his walk-through, Detective Langston believed that the victim's death was not an accident and shared his concerns with Sergeant Touchstone. Detective Langston spoke to the victim's daughter about the victim's daily routine and habits and discussed certain items in the crime scene with them. Of immediate interest to Detective Langston was the coffee cup on the clothes hamper because "[i]t was totally out of place from the rest of the crime scene." Detective Langston wanted prints from the coffee cup and specifically instructed Officer Monday to fingerprint the coffee cup. Detective Langston did not observe Officer Monday take a latent lift from the cup, but he did not see Officer Monday print anything else either. The detective acknowledged that Officer Monday would have also followed the orders of other detectives on the scene as to what was photographed and fingerprinted.

Detective Langston testified that there were no signs of forced entry into the home, which indicated that the victim may have known the perpetrator. He learned that, during the first part of January, the victim had hired a company to do insulation work at the home, and he eventually determined that three employees of Thermo Foam had worked at

---

[3] Both Detective Brown and Sergeant Touchstone were deceased by the time of the Defendant's trial.

- 11 -

the victim's home—the Defendant, Eddie Cooke, and Anthony Stitts. Detective Langston wanted to talk to all of the employees of the company, including the owners. Detective Langston quickly interviewed two of the employees who had worked at the victim's house, Mr. Cooke and Mr. Stitts, and the crew foreman, Mr. Lambert, and found no evidence linking these men to the murder. Detective Langston also confirmed that a ring given to Mr. Cooke's girlfriend shortly after the murder did not match the description of the victim's missing ring. Despite looking for the Defendant where he was supposed to be living, Detective Langston was unable to locate the Defendant. He later learned that the Defendant had gone to Mississippi.

When Detective Langston became the lead investigator on the case about two weeks after the murder, he learned that Officer Monday had been able to retrieve a latent print from the scene. Detective Langston was extremely interested in the fingerprint because, based on the location of where he understood the fingerprint to have been collected, the fingerprint was not adequately explained by the fact that there had been workers in and out of the victim's home several weeks before the murder. While looking for the Defendant, investigators were trying to determine if the latent fingerprint lifted from the scene could be matched to any of the business employees.

On March 7, 1979, Detective Langston learned that the Defendant was being held in local custody on an unrelated offense and waiting to be transported to another jurisdiction. When the Defendant was booked on the unrelated charge, a fresh fingerprint card had been created for him. Detective Langston asked Joann Mabry, an employee in MNPD's identification division, for an "emergency comparison" to be done between the Defendants' prints and the latent print lifted from the crime scene, but Ms. Mabry could not make a match. On March 8, 1979, Detective Langston was able to interview the Defendant "very briefly" before the Defendant's transport, and the Defendant said he had nothing to do with the victim's death. The investigation into the victim's murder grew cold after Detective Langston's interview with the Defendant.[4]

Joann Mabry testified that she began working in the ID division of the MNPD in 1974. Ms. Mabry explained that she booked and fingerprinted prisoners when they were arrested. She would then put the fingerprint cards into a criminal file, classify them, and search other files manually to see if the prints were associated with any previous arrests or criminal records. Ms. Mabry explained that she would compare fingerprint cards to other fingerprint cards to "make sure [individuals were] using the right name and that they didn't have any prior arrest record." She testified, however, that she had "very little" training in comparing inked fingerprint cards to latent fingerprints lifted from a

---

[4] Detective McElroy reopened the investigation in 1993, but his investigation did not lead to any new developments in the case.

crime scene. She was "very rarely" asked to make such a comparison and only did so in emergency situations when there was not a latent print examiner available. Ms. Mabry recalled that, when latent fingerprint lifts would be brought into the division by an officer, they would be in an envelope that contained the date, complaint number, and possible suspect. If Ms. Mabry reviewed a latent print against an inked fingerprint card and could not make a match, she would indicate that it was a "negative find," meaning that there were not enough points of comparison to say that the prints matched to the same person. Ms. Mabry recalled that she compared the latent fingerprint from the scene of the victim's murder to the Defendant's fingerprints because no other examiner was available at the time, and she did not make a match.

Sergeant William Foster testified that he retired from the MNPD after thirty-eight years of service. Sergeant Foster worked almost exclusively in the ID division, and after he was promoted to sergeant in 1972, he became shift supervisor of the division. His duties included supervising field identification officers working crime scenes. Sergeant Foster explained that officers from the ID division would respond to a crime scene and process the scene for evidence. The officers would photograph and diagram the scene, dust for latent prints, and collect, bag, and tag evidence to be turned over to the property room. Upon returning to the ID division, field officers would turn in their crime scene reports, film from the scene, and latent prints in three separate baskets in the division. Sergeant Foster would then pull the field reports and "review the reports for accuracy to make sure that it fell within the policy." Sergeant Foster made sure that the scene of the victim's death was photographed and processed for evidence, items were dusted for fingerprints, and a diagram or sketch of the scene was made.

Sergeant Foster testified that crime scenes were investigated differently in the late 1970's. For example, officers did not put up crime scene tape in 1979 but eventually began the practice in order to keep out unauthorized personnel and reduce the risk of contamination of the scene. Additionally, in January 1979, ID officers were not aware of DNA. They could type blood, but there was no other type of bodily fluid analysis being done at the time. When an ID field officer arrived at a death scene, the officer would check in with the first officer on the scene and then wait for directions from a homicide investigator. Sergeant Foster explained that a homicide investigator would relay information to the ID officer, and the investigator and ID officer would "formulate [a] plan of how they [were] going to process the scene." According to Sergeant Foster, it was standard practice for the ID officers to first photograph the scene and pieces of evidence, working clockwise around each room. The officer would then draw a sketch of the scene. After that, the ID officer would dust for fingerprints on items that "had been identified that the perpetrator may have touched." The officer would then systematically collect evidence and tag it, listing on the property tag the date, time, and location from

which the evidence was collected. The ID officer was also required to sign the property tag.

According to Sergeant Foster, ID officers used a black powder to dust for prints, and after a print was lifted, it would be placed on a three by five index card using fingerprint lift tape. Once the fingerprint was transferred to the latent card, the ID officer was required to fill out the opposite side of the card, noting the date and time the lift was taken, what object the latent was lifted from, and who lifted the latent print. Sergeant Foster testified that it was important to put this detailed information on the latent lift card because all latent lift cards from one crime scene would be placed into the same jacket or envelope. When an ID officer placed an envelope of latent prints into the designated basket in ID office, the prints would stay in the basket until an examiner from the latent print section would take them to be processed—usually the following morning. Sergeant Foster explained that, in 1979, the object on which the latent print was found was not always collected as evidence once the print was lifted because the important evidence had already been removed from the object.

Regarding his involvement in the Defendant's case, Sergeant Foster testified that he never went to the crime scene at the victim's residence. However, as Officer Monday's supervisor, he reviewed Officer Monday's crime scene report on January 30, 1979, and signed off on the report. Sergeant Foster ensured that Officer Monday had followed proper procedure in processing and photographing the scene, dusting for fingerprints, collecting evidence, and turning the evidence into the property room in a timely manner and that Officer Monday's crime scene report contained the requisite detail. Sergeant Foster testified that, if some piece of evidence had appeared to be incomplete, he would not have signed off on Officer Monday's report.

Julia Hooper testified that she began working with MNPD in 1975 and was an identification division supervisor. Ms. Hooper testified as an expert in latent fingerprint identification. She explained that, when latent prints were received from a crime scene, the print was first evaluated to determine whether it was clear enough that an identity could be determined from the print. For the latent prints that were identifiable, Ms. Hooper needed a suspect whose fingerprints she could compare to the latent print. She stated that, once an identification was made from a latent print, the identification was verified by another examiner.

Ms. Hooper explained that comparing latent prints to a known print was more challenging than comparing ten-print cards, which were made at the time of an individual's arrest, to other ten-print cards. Latent print examiners at MNPD went through a two-year training program and completed additional training and competency testing throughout their career. Ms. Hooper recalled that Ms. Mabry worked in the ID

division in 1979 and her primary duties had been classifying fingerprint cards and comparing ten-print cards to other ten-print cards. However, Ms. Mabry did not have the training necessary to do latent print examinations.

Ms. Hooper recalled that Sergeant Postiglione asked her to look at the latent print recovered from the crime scene by Officer Monday. She retrieved the envelope containing the latent lift card out of the ID division's file. She noted that the envelope contained only one latent lift card, and the card contained information from Officer Monday about the print. Ms. Hooper determined that the latent print came from the left middle finger of an individual. Ms. Hooper testified that, along with the identifiable latent fingerprint, there were also multiple "lay-downs of an impression" on the lift card, which appeared to be from the tip of a finger. She explained that the impressions on the lift card were consistent with someone holding a cylindrical object but that the other lay-down impressions were of no value for identification purposes.

After retrieving the latent print from the file, Ms. Hooper compared it to the Defendant's ten-print card and identified the latent print as belonging to the Defendant. The print match was verified by Ms. Adelman, another latent print examiner at MNPD. Ms. Hooper testified that, while the latent print that was submitted came from the Defendant, she could not tell when the print had been left in the victim's home. Ms. Hooper stated that if a detective had asked her to make the same comparison in 1979, she would have been able to identify the Defendant as the source of the latent print, but she was never asked to do so.

During a jury-out hearing, Ms. Hooper testified that latent print envelopes were kept in files located inside the ID office. The ID office had moved one time since 1979, and the file cabinets were moved to the new location under the supervision of the ID division. Ms. Hooper testified that, in 1979, it would not have been unusual for a latent print envelope to contain only one latent lift card. When latent prints were lifted at a crime scene, the prints remained unidentified until a suspect was developed. However, today automated fingerprint identification systems could be used to develop suspects, and that has caused ID officers to dust for and collect more latent prints. Ms. Hooper testified that Officer Monday's crime scene report indicated that he dusted several items for fingerprints, including the coffee cup, a carton of cigarettes, and "various other items" and stated that he collected "partials." Ms. Hooper explained that the one lift card turned in by Officer Monday had several impressions on it. Based upon her knowledge of the business practices in ID division, Ms. Hooper did not believe that Officer Monday created more than one lift card. Moreover, Ms. Hooper knew Officer Monday and described him as being "meticulous" in his work. She reviewed his report and noted that he dusted several items for prints. She believed that Officer Monday's reference in his

report to the plural "partials" meant that he lifted several prints onto one card but conceded it was possible that he lifted several prints separately.

Randy Lambert testified that, in January 1979, he worked as a foreman for Thermo Foam of Tennessee, an insulation company. Mr. Lambert and his work crew would install foam insulation into attics and floors. At that time, Mr. Lambert's work crew consisted of Mr. Cooke, Mr. Stitts, and the Defendant. Mr. Stitts and Mr. Cooke were white males, and the Defendant was a black male. Mr. Cooke and Mr. Stitts lived together in a house on Raymond Street, which they rented from a friend of Mr. Lambert. Mr. Lambert described the Defendant as a "pretty good size guy, had big arms . . . [the Defendant] had arms so big, he claimed he couldn't tie a tie because he couldn't touch his neck." In early January 1979, Mr. Cooke, Mr. Stitts, and the Defendant worked on an insulation job at the victim's residence. Mr. Lambert recalled dropping the three men off at the victim's house and that the victim had offered the workers some refreshments. Mr. Lambert testified that the Defendant had "kind of vanished in the same time frame" of the victim's murder. When homicide detectives questioned Mr. Lambert about the murder, they told him they were looking for the Defendant. According to Mr. Lambert, the Defendant had disappeared and "just didn't come back to work one day."

John Williams testified that he was incarcerated at Metro Detention Facility ("MDF") in late 2011 and early 2012. Mr. Williams explained that he had a previous conviction for burglarizing his grandfather's business. Although he was initially placed on probation for two years, Mr. Williams had violated his probation several times and was ordered to serve his sentence. While he was serving that sentence, he was housed with the Defendant at MDF in "Bravo pod" for about six weeks. Mr. Williams described the pod as an open bay area with bunk beds and explained that inmates were allowed to come and go as they pleased in the pod. There were fifty-two men per side in a pod, and Mr. Williams and the Defendant were in the side designated as "Bravo one." Mr. Williams testified that he had to walk past the Defendant's bunk every time he went in and out of the sleeping area. While an inmate at MFD, Mr. Williams befriended the Defendant, who was an older man, in an attempt to stay "out of trouble," and the two talked regularly.

Mr. Williams recalled that the Defendant was suddenly transported out of Bravo pod in early February 2012. He then saw a television news story stating that the Defendant had been charged with a homicide from 1979. Shortly after he saw the news story, the Defendant returned to Bravo pod. Several inmates questioned the Defendant about his absence, and the Defendant stated that he had "just been hit with three sealed indictments." Later that night, Mr. Williams asked the Defendant about the new charges. According to Mr. Williams, the Defendant initially "tried to tell [him] that there was a homicide back in 1979 when an elderly lady was found dead, that the detectives at that

point had told [the Defendant] that she had had a heart attack." Mr. Williams explained that he did not believe the Defendant based upon the way the Defendant "was carrying himself," so he "pushed a little harder." The Defendant told Mr. Williams that he had done "some kind of duct work or insulation" on the victim's home and that he had strangled the victim and put her in the bathtub. The Defendant mentioned that he was not worried about fingerprint evidence; he stated that his fingerprints were going to be in the victim's house because of the work he had done there. The Defendant said that other workers at the house had been interviewed by police, but he was the only one labeled as a suspect. He told Mr. Williams that he had been the only black worker on the crew and that the other workers were white. Two days after this conversation with the Defendant, Mr. Williams was released from jail on determinate release probation. He called the police two days later and reported what the Defendant had told him.

On cross-examination, Mr. Williams acknowledged that, at the time of his release from MDF, he did not believe he would be successful on probation, but he denied that he was seeking any special treatment from authorities when he reported the Defendant's admissions. Mr. Williams testified that he had received no consideration for coming forward, and the one time he called the prosecutor on the Defendant's case about a potential probation violation, the prosecutor offered him no assistance.

Susan Niland, the Director of Communications for the Davidson County District Attorney General's Office, testified that as part of her job responsibilities she followed cases in the media that were being prosecuted by the district attorney's office. At the prosecutor's request, she contacted local news stations and obtained all media coverage from the week of February 13, 2012, relating to the Defendant and the victim. Ms. Niland reviewed the television news stories that aired that week and found the stories did not mention the victim's being found in the bathtub. Additionally, the television news stories did not mention that the police had interviewed other workers from Thermo Foam or that the Defendant was the only African-American worker at the victim's residence. Ms. Niland also reviewed print media from the week of February 13, 2012. She found no information in the print media that the victim was found in the bathtub, that other workers were interviewed by the police, or that the Defendant was the only African-American on the work crew. While the news coverage contained information that the victim was strangled to death and that an insulation company had been at her home before her death in 1979, Ms. Niland found no mention of the fingerprint match, which led investigators to charge the Defendant. The reports contained only speculation that the police had DNA evidence.

Tom Davis, the Director of Records for the Davidson County Sheriff's Office, testified that he was asked to pull the inmate housing records from MDF for the Defendant and Mr. Williams for trial. Based upon these records, Mr. Davis testified that,

between September 29, 2011 and February 15, 2012, the Defendant was housed in bed number 32 of section B1 in B pod. Mr. Davis explained that the layout of B pod was similar to a military barracks setting "where it's open and there are bunk beds in rows where inmates sleep" and that the inmates were able to interact with others in their pod. According to the housing records, the Defendant was moved on February 13, 2012, to the Criminal Justice Center for booking on additional charges and returned to B1 pod the same day. The Defendant's last day in B1 pod was February 15, 2012.

Mr. Davis further testified that the MDF housing records for Mr. Williams showed that, between January 6, 2012 and January 24, 2012, Mr. Williams was also housed in B1 in bed 1. On January 24, 2012, Mr. Williams was moved to another bed that was closer to the Defendant's where Mr. Williams stayed until he was also released from jail on February 15, 2012. The Defendant and Mr. Williams were housed together in B pod between January 6, 2012, and February 15, 2012. During that time, there were no disciplinary actions taken against the Defendant or Mr. Williams that would indicate any problems between the two men.

Sergeant Pat Postiglione testified that he joined the MNPD in 1980 and was a homicide detective for over twenty-five years before he retired from the police force. In 2003, Sergeant Postiglione took over as the supervisor of the homicide cold case unit. In the fall of 2011, members of the victim's family contacted him and asked him to look into the victim's 1979 murder. Sergeant Postiglione located the file on the victim's murder and took the physical evidence to the Tennessee Bureau of Investigation crime lab for serology and DNA testing. In reviewing the file, he noted that there had been work done on the victim's home about two weeks prior to her murder. Sergeant Postiglione believed that the individuals who had worked on the home could have been potential suspects. He noted that all of the workers had been cleared in 1979 except for the Defendant.

Sergeant Postiglione interviewed the victim's family members and tried to locate the owners of Thermo Foam and the company's employees from 1979. The sergeant discovered that Mr. Stitts was deceased. He learned that Mr. Cooke had been shot in the head in the mid-1980s. Family members had not seen Mr. Cooke since 2002 and believed that he was possibly in a nursing home or deceased. Sergeant Postiglione interviewed the crew foreman, Mr. Lambert, as well as Merrill Wise, the telephone company repairman that had accompanied Ms. Crossland into the home on the day of the victim's murder. Mr. Wise had "[v]ery limited recollection" about the event. Sergeant Postiglione then spoke to Officer Bobby Bass, the first officer on the scene, but Officer Bass had no memory of the crime.

Sergeant Postiglione reviewed the crime scene report created by the ID officer at the crime scene, Officer Monday, and learned that Officer Monday had lifted one latent fingerprint. Sergeant Postiglione then obtained the latent lift card created by Officer Monday. On the latent lift card, Officer Monday documented that the print had been lifted from inside the crime scene. Sergeant Postiglione testified that the location of the latent fingerprint was important "because [] the location where the print was found couldn't easily be explained away as to someone who may have been working at the house two weeks prior . . . ." Although the latent print had been compared to the Defendant's fingerprints in 1979, Sergeant Postiglione wanted the comparison made again and contacted Ms. Hooper. After making the comparison, Ms. Hooper informed Sergeant Postiglione that the latent print matched the Defendant's prints.

On January 12, 2012, Sergeant Postiglione interviewed the Defendant. When Sergeant Postiglione showed the Defendant a photograph of the victim, the Defendant initially said that he did not recognize her. When shown a photograph of the victim's home, however, the Defendant immediately recognized it as being a home he had done some work on in 1979. The Defendant said that he had done some work on the home for a couple of days. The Defendant eventually told Sergeant Postiglione that he recognized the victim from her photograph but said that he had never interacted with the victim and never ate or drank inside her home. The Defendant denied ever having any personal conversations with the victim and insisted that the only contact he had with the victim had been when he asked to use her telephone one time. Sergeant Postiglione did not tell the Defendant that the Defendant's fingerprint had been found in the crime scene, and he never discussed the fact that the victim was found in the bathtub. Sergeant Postiglione testified that, although the Defendant admitted to being in the victim's home in January 1979, the fact that the Defendant had access to the home weeks prior to the murder did not adequately explain the location of the Defendant's fingerprint in the house. Additionally, the location of the fingerprint in the crime scene was not explained by the Defendant's admission to handling the telephone. Sergeant Postiglione testified that he interviewed the Defendant a second time on February 10, 2012, and told the Defendant that he was being indicted. The Defendant maintained that he had nothing to do with the victim's murder.

After the Defendant's indictment, MNPD issued a press release about the case. Sergeant Postiglione was consulted prior to the press release and made sure that details of the murder were held back from the media. Specifically, the police department withheld that the victim had been found naked in a bathtub, that the victim was initially thought to have died from a heart attack, and that the Defendant's fingerprints had been matched to the latent print lifted from the scene.

On February 17, 2012, Sergeant Postiglione was contacted by Mr. Williams. During a subsequent interview, Mr. Williams told the sergeant about the Defendant's confession. Mr. Williams knew details about the victim's murder that had not been released to the public in 2012. He knew that the victim had been found in the bathtub, and according to Sergeant Postiglione, no one outside of the investigation in 2011 and 2012 knew about this fact. On cross-examination, Sergeant Postiglione acknowledged that the Nashville Banner had printed a news article on January 30, 1979, about the murder and that the article mentioned that the victim had been found in a bathtub.[5] The article also mentioned that there had been blood in the bathtub and that the victim had a history of heart problems, and it quoted the medical examiner as saying it was too early to determine how the victim died.

The parties stipulated that the Defendant was in Tunica, Mississippi on March 1, 1979, and the State entered into evidence a certified copy of the victim's death certificate, which indicated that the cause of death was manual strangulation.

Robert Keith Womble testified that his oldest daughter had dated Mr. Williams for a couple of years and that Mr. Williams had lived in his residence for a period of time. Mr. Womble explained that he knew some of Mr. Williams' family members and that he had spoken with other people in the community about Mr. Williams. When asked about Mr. Williams' reputation for truthfulness, Mr. Womble stated, "I very rarely believe anything he tells me." He described Mr. Williams as having a felony record, wanting to impress others, and being a generally dishonest man.

Following this testimony, a jury found the Defendant guilty of the lesser-included offense of second degree murder in count one and first degree felony murder in count two. The jury sentenced the Defendant to twenty-five years for second degree murder and to life for first degree felony murder. The trial court later merged the Defendant's conviction for second degree murder into his conviction for first degree felony murder, for an effective life sentence.[6]

---

[5] The parties agreed that this article was not currently available on the internet but had been found on microfilm.

[6] We note that the judgments entered by the trial court on May 3, 2013, do not accurately reflect the jury's verdict and sentence. The judgment in Count One should state that the Defendant was convicted of the lesser-included offense of second degree murder, but it should not impose a conviction or a sentence and should note the merger of Count One into the conviction in Count Two. The judgment for Count Two should reflect that the Defendant was convicted of first degree felony murder and sentenced to life and that the second degree murder verdict in Count One merges into Count Two.

Thereafter, the Defendant filed a timely motion for new trial and an amended motion for new trial. Following a hearing, the trial court entered an order denying the Defendant's request for a new trial, and this timely appeal followed.

## Analysis

### A. Admissibility of the Latent Fingerprint

In ruling on the admissibility of the latent fingerprint, the trial court found that the State had established with reasonable assurance that "the fingerprint is identifiable to a specific person, that it was lifted from the crime scene on January 29, 1979, and that it is not the type of evidence easily . . . susceptible to contamination, alteration, or [that it is] anything other than what it is purported to be." On appeal, the Defendant agrees that the latent print matches his fingerprint and, therefore, is identifiable to a specific person. Nonetheless, the Defendant maintains that the trial court erred in admitting evidence of the latent print because it was not properly authenticated. The Defendant asserts that the latent print could not be reliably determined to have come from the victim's home because of the absence of any testimony from Officer Monday. Furthermore, the Defendant insists that the State failed to establish the integrity of the latent print because the possibility of loss, substitution, or mistake with respect to the evidence existed due to the "chaos" at the crime scene. The State responds that the trial court properly admitted the evidence because the proof sufficiently established both the latent print's integrity and that it was lifted from the crime scene in the victim's home. We agree with the State.

Tennessee Rule of Evidence 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Tenn. R. Evid. 901(a). The Tennessee Supreme Court has previously recognized that it is "well-established that as a condition precedent to the introduction of tangible evidence, a witness must be able to identify the evidence or establish an unbroken chain of custody." State v. Scott, 33 S.W.3d 746, 760 (Tenn. 2000) (internal quotation marks omitted). The purpose of the chain of custody requirement is "to demonstrate that there has been no tampering, loss, substitution, or mistake with respect to the evidence." Id. (quoting State v. Braden, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993)) (internal quotation marks omitted). Even though each link in the chain of custody should be sufficiently established, Rule 901(a) does not require that the identity of tangible evidence be proven beyond all possibility of doubt; nor is the State required to establish facts which exclude every possibility of tampering. State v. Cannon, 254 S.W.3d 287, 296 (Tenn. 2008) (citing Scott, 33 S.W.3d at 760). "[W]hen the facts and circumstances that surround tangible evidence reasonably establish the identity and integrity of the evidence, the trial court should admit the item into evidence."

Id. In addition, the State's failure to call as a witness each person who handled an item does not necessarily preclude the admission of the evidence. Id. Absent sufficient proof of the chain of custody, however, the "evidence should not be admitted . . . unless both identity and integrity can be demonstrated by other appropriate means." Scott, 33 S.W.3d at 760 (quoting Neil P. Cohen et. al., Tennessee Law of Evidence § 901.12, at 624 (3d ed.1995)).

We review a trial court's determination of the chain of custody of evidence under the abuse of discretion standard. Cannon, 254 S.W.3d at 295 (citing Scott, 33 S.W.3d at 752). Generally, "[a] trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." State v. Phelps, 329 S.W.3d 436, 443 (Tenn. 2010).

With regard to the trial court's finding that the latent print was lifted from inside the crime scene, the State presented evidence that Detective Langston observed a coffee cup inside the crime scene sitting on top of the clothes hamper in the hallway. Detective Langston was immediately interested in the coffee cup because "[i]t was totally out of place from the rest of the crime scene." The detective spoke to the victim's daughter who was at the crime scene and learned that the victim would not have left the coffee cup in that location. Believing that the coffee cup may have been used by the suspect, Detective Langston specifically instructed the ID officer on scene, Officer Monday, to photograph the cup, dust the coffee cup for fingerprints, and collect the liquid that was present inside the cup. Although he did not watch Officer Monday lift the print from the coffee cup, Detective Langston later saw the latent lift card created by Officer Monday. Detective Langston also identified the photograph of the coffee cup taken by Officer Monday.

Sergeant Foster testified that, when an ID field officer arrived at a death scene, the officer would check in with the first officer on the scene and then wait for directions from a homicide investigator. Sergeant Foster described the standard practice for an ID officer at a crime scene. He indicated that an ID officer would first photograph the scene and pieces of evidence and then dust for fingerprints on items that "had been identified that the perpetrator may have touched." If a fingerprint was lifted, the print would be transferred to a three by five index card using fingerprint lift tape. The ID officer would then fill out the opposite side of the latent lift card, noting the date and time the lift was taken, what object the latent print was lifted from, and who lifted the print.

Sergeant Foster explained that all latent lift cards from one crime scene would be placed into the same envelope. Upon returning to the ID division, the ID officer would turn in his crime scene report, film from the scene, and envelope of latent prints, placing these items in three separate baskets located inside the division. Once an ID officer

placed an envelope of latent prints into the designated basket in the ID office, the envelope remained in the basket until an examiner from the latent print section took the prints to be processed. Sergeant Foster testified that he personally reviewed Officer Monday's work on January 30, 1979. He noted that Officer Monday had followed proper procedure in processing and photographing the scene, dusting for fingerprints, collecting evidence, and turning evidence into the property room in a timely manner.

Both Detective Langston and Ms. Mabry testified that Ms. Mabry compared the latent fingerprint from the scene of the victim's murder to the Defendant's fingerprints in March 1979. Ms. Mabry noted on the back of the latent print envelope that she had compared the latent print to "Freddie Lee Johnson" and that she had negative results. In 2011, when asked by Sergeant Postiglione to attempt a second comparison, Ms. Hooper pulled the latent print envelope associated with the case from the ID division's files. She noted that the outside of the envelope contained Ms. Mabry's notations. Inside the envelope was the latent lift card signed by Officer Monday. Ms. Hooper testified that the impressions on the lift card were consistent with someone holding a "cylindrical object."

The State also introduced at the pretrial hearing the latent lift card, the envelope containing the latent print card, and Officer Monday's crime scene report. These items of evidence are consistent with the testimony of Detective Langston, Sergeant Foster, and Ms. Hooper. Officer Monday's crime scene report specifically states that he "[d]usted coffee cup in hallway and obtained partial latent." The latent print lift card bears Officer Monday's signature, the date and time the print was lifted, and indicates that the print was "lifted from: coffee cup," "location: top of clothes hamper hallway." Additionally, the outside of the latent lift envelope contains Officer Monday's notation of the date of the offense, the victim's name, and the address of the crime scene.

Although the Defendant contends that the "chaos" at the crime scene suggests that the print was somehow contaminated, there is no suggestion that the latent print was tampered with in any way or that the print was lifted from an area outside the crime scene. Believing the victim's death to be a homicide and that the coffee cup had been used by the suspect, Detective Langston specifically requested that the coffee cup be printed, and there is nothing in the record to suggest that Officer Monday failed to comply with Detective Langston's request. Also nothing suggests that the print was somehow planted by investigators. The Defendant did not become a suspect until several days later, when he could not be found to be interviewed, and Ms. Mabry's initial review of the latent lift card met with negative results.

Regarding the integrity of the latent print once it was lifted, Ms. Hooper testified that latent print envelopes were kept in files located inside the ID office. The ID office had moved one time since 1979, and the file cabinets were moved to the new location

under the supervision of the ID division. Ms. Hooper testified that, in 1979, it would not have been unusual for a latent print envelope to contain only one latent lift card. Ms. Hooper testified that Officer Monday's crime scene report indicates that he dusted several items for fingerprints, including the coffee cup, a carton of cigarettes, and "various other items" and states that he collected "partials." Ms. Hooper explained that the one lift card turned in by Officer Monday had several impressions on it. Based upon her knowledge of the business practices in ID division, Ms. Hooper did not believe that Officer Monday created more than one lift card. Moreover, Ms. Hooper knew Officer Monday and described him as being "meticulous" in his work. She reviewed his report and noted that he dusted several items for prints. She believed that Officer Monday's reference in his report to the plural "partials" meant that he lifted several prints onto one card. This was consistent with Ms. Hooper's additional finding of multiple "lay-downs of an impression" on the latent lift card.

The Defendant argues that chain of custody was not sufficiently established because Officer Monday's crime scene report and the latent print card containing his writing was inadmissible hearsay evidence. However, as set out above, the facts and circumstances surrounding the collection of the latent print reasonably establish that it was lifted from an item inside the crime scene even without this evidence. In any event, because the Defendant opted to litigate the admissibility of the latent fingerprint pretrial, the trial court was authorized to consider hearsay in making its ruling. Rule 104 of the Tennessee Rules of Evidence specifically provides that "[p]reliminary questions concerning . . . the admissibility of evidence shall be determined by the court . . . . In making its determination the court is not bound by the rules of evidence except those with respect to privileges." Tenn. R. Evid. 104(a); see generally United States v. Hernandez, 778 F. Supp. 2d 1211, 1226 (D.N.M. 2011) (stating that "[t]here is no binding precedent from the Supreme Court or this court concerning whether *Crawford* applies to pretrial suppression hearings" and noting that confrontation rights apply only to trial). The Advisory Commission Comments to Rule 104 provide: "Part (a) governs the fact questions to be resolved by trial courts in deciding whether a sufficient foundation has been laid . . . . This preliminary determination can be based on hearsay, because the judge should be able to separate reliable from unreliable proof."[7] Tenn. R. Evid. 104, Advisory Comm'n Cmts.

Based upon the foregoing, we agree with the trial court that the State reasonably established the identity and integrity of the latent lift card as containing a fingerprint lifted from the crime scene on January 29, 1979. The identity of tangible evidence was

---

[7] The Defendant made no objection when the State offered the latent print card into evidence at the pretrial hearing, and the Defendant entered Officer Monday's crime scene report into evidence during the same hearing.

- 24 -

not required to be proven beyond all possibility of doubt. Cannon, 254 S.W.3d at 296. Moreover, there was simply no proof to suggest that, once lifted, the fingerprint on the latent lift card was tampered with or otherwise handled incorrectly. Because the State adequately established the chain of custody, the trial court did not abuse its discretion in admitting the evidence.

### B. Testimony on the Location of the Defendant's Fingerprint

The Defendant also contends that the trial court's ruling that the State could introduce testimony that the Defendant's fingerprint was lifted from the crime scene in an area that "raised a red flag" violated his right to confrontation. The Defendant asserts that Officer Monday was the only witness capable of testifying that the Defendant's fingerprint was lifted from the crime scene and cross-examination of Officer Monday on the preservation of the scene and on any orders he received from Detective Brown would have been "crucial" to the case. The State responds that the testimony that the fingerprint raised a red flag did not involve hearsay proof, and in any event, Officer Monday's statements are not testimonial under Williams v. Illinois.

Whether the admission of hearsay statements violated a defendant's confrontation rights is a question of law we review de novo. State v. Marlo Davis, ____ S.W.3d _____, _____ 2015 WL 3504853, at *14 (Tenn. 2015) (citing State v. Lewis, 235 S.W.3d 136, 141-42 (Tenn. 2007)). "'The application of the law to the facts found by the trial court is a question of law' that is subject to de novo review." Lewis, 235 S.W.3d at 142 (quoting State v. Maclin, 183 S.W.3d 335, 343 (Tenn. 2006)).

In a criminal trial, the defendant has a right "to be confronted with the witnesses against him." U.S. Const. amend. VI. Similarly, the Tennessee Constitution provides "[t]hat in all criminal prosecutions, the accused hath the right . . . to meet the witnesses face to face." Tenn. Const. art. I, § 9. Our supreme court has described the Tennessee Constitution as imposing "a higher right than that found in the federal constitution." State v. Deuter, 839 S.W.2d 391, 395 (Tenn. 1992). However, "when deciding claims based on the right to confrontation provided in article I, section 9, we have expressly adopted and applied the same analysis used to evaluate claims based on the Confrontation Clause of the Sixth Amendment." State v. Dotson, 450 S.W.3d 1, 62 (Tenn. 2014).

In Crawford v. Washington, 541 U.S. 36, 59 (2004), the United States Supreme Court held that the Confrontation Clause allowed admission of "[t]estimonial statements of witnesses absent from trial . . . only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." Two years after Crawford, the Supreme Court held that the Confrontation Clause applies only to testimonial hearsay and does not apply to nontestimonial hearsay. Davis v. Washington, 547 U.S. 813, 823-

24 (2006).  To distinguish between testimonial and nontestimonial statements, the Court adopted what has become known as "the primary purpose test," concluding:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.  They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

Id. at 822.

In Melendez-Diaz v. Massachusetts, 557 U.S. 305, 307, 311 (2009), the Court concluded that "affidavits reporting the results of forensic analysis which showed that material seized by the police and connected to the defendant was cocaine" were testimonial and subject to exclusion under the Confrontation Clause analysis.  Based on the facts of the case, the Court concluded that "the affidavits [were] made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."  Id. at 311 (citations and internal quotation marks omitted).  Moreover, "under Massachusetts law the *sole purpose* of the affidavits was to provide 'prima facie evidence of the composition, quality, and the net weight' of the analyzed substance."  Id. (quoting Mass. Gen. Laws, ch. 111, § 13) (emphasis in original).  "Absent a showing that the analysts were unavailable to testify at trial *and* that [the defendant] had a prior opportunity to cross-examine them, [the defendant] was entitled to be confronted with the analysts at trial."  Id. (citations and internal quotation marks omitted) (emphasis in original).

Two years later, in Bullcoming v. New Mexico, ____ U.S. ____ 131 S.Ct. 2705, 2709 (2011), the Court held that the defendant's confrontation rights were violated when the prosecutor introduced results of forensic testing of the defendant's blood alcohol concentration through the testimony of a forensic analyst who was familiar with the laboratory's testing procedure but who did not participate in or observe the test on the defendant's blood sample.  The Court reiterated the rule that a testimonial statement may not be introduced at trial unless the witness who made the statement is unavailable and the defendant had a prior opportunity to confront the witness.  The Court rejected the argument that the "comparative reliability of an analyst's testimonial report drawn from machine-produced data" allowed a surrogate witness's testimony to satisfy the constitutional confrontation requirement.  Id. at 2715.  The Court explained, "[The Confrontation Clause] does not tolerate dispensing with confrontation simply because the

court believes that questioning one witness about another's testimonial statements provides a fair enough opportunity for cross-examination." Id. at 2716.

Most recently, the United States Supreme Court released its opinion in Williams v. Illinois, ____ U.S. ____, 132 S.Ct. 2221 (2012). Williams involved a bench trial in a rape case during which a forensic specialist from an Illinois state laboratory testified that she matched a DNA profile produced by an outside laboratory from a vaginal swab taken from the victim to a DNA profile that the state laboratory obtained using a sample of the defendant's blood. A plurality of the Court concluded that the testimony did not violate the Confrontation Clause. Id. at 2240. The Court also noted that the outside laboratory's report had not been introduced into evidence, but the Court concluded that there would have been no Confrontation Clause violation even if the report had been entered for its truth. Id. at 2242.

The Court explained that statements which violate the Confrontation Clause share two characteristics: "(a) they involved out-of-court statements having the primary purpose of accusing a targeted individual of engaging in criminal conduct and (b) they involved formalized statements such as affidavits, depositions, prior testimony, or confessions." Id. at 2242. Additionally, while the Court noted that the reports in Melendez-Diaz and Bullcoming qualified as testimonial statements, those cases "did not hold that all forensic reports fall into the same category." Id. at 2243. Instead, those reports violated the Confrontation Clause

> because they were the equivalent of affidavits made for the purpose of proving the guilt of a particular criminal defendant at trial. There was nothing resembling an ongoing emergency, as the suspects in both cases had already been captured, and the tests in question were relatively simple and can generally be performed by a single analyst.

Id. The Court also noted that the technicians who prepared the reports in Melendez-Diaz and Bullcoming must have realized that the reports' contents would be incriminating. Id. When applying an objective test to determine the primary purpose of an out-of-court statement, the Court explained, "We look for the primary purpose that a reasonable person would have ascribed to the statement, taking into account all of the surrounding circumstances." Id. (citations omitted). In light of that standard, the Court concluded that the primary purpose of the independent laboratory's DNA report "was not to accuse the defendant or to create evidence for use at trial" but instead was to "catch a dangerous rapist who was still at large." Id. In his concurring opinion, Justice Breyer recognized that "[a]utopsies, like the DNA report in this case, are often conducted when it is not yet clear whether there is a particular suspect or whether the facts surrounding the autopsy will ultimately prove relevant in a criminal trial." Id. at 2251 (Breyer, J. concurring).

Justice Thomas, though providing the fifth vote, rejected the "primary target" rationale and held that the confrontation clause was implicated when the out-of-court statement possessed sufficient "indicia of solemnity." Id. at 2259 (Thomas, J., concurring in the judgment).

In State v. Dotson, the Tennessee Supreme Court noted that the fractured decision in Williams provided "little guidance and is of uncertain precedential value because no rationale for the decision—not one of the three proffered tests for determining whether an extrajudicial statement is testimonial—garnered the support of a majority of the Court." Dotson, 450 S.W.3d at 68. Ultimately, the Dotson Court adopted the District of Columbia Court of Appeals' reading of Williams:

> It therefore is logically coherent and faithful to the Justices' expressed views to understand Williams as establishing—at a minimum—a sufficient, if not a necessary, criterion: a statement is testimonial at least when it passes the basic evidentiary purpose test plus either the plurality's targeted accusation requirement or Justice Thomas's formality criterion. Otherwise put, if Williams does have precedential value . . . an out-of-court statement is testimonial under that precedent if its primary purpose is evidentiary and it is either a targeted accusation or sufficiently formal in character.

Id. at 69 (quoting Young v. United States, 63 A.3d 1033, 1043-44 (D.C. 2013)).

In this case, we initially note that the Defendant has failed to provide citations to the record or otherwise identify the specific trial testimony that he claims violated his right to confrontation. In his brief, the Defendant asserts that the trial court permitted the offending testimony through "other witnesses," without identifying those witnesses. Tennessee Court of Criminal Appeals Rule 10(b) provides that an issue is subject to waiver if it is not properly supported by citation to the record. Nonetheless, the State does not argue waiver, and given the seriousness of the crime for which the Defendant stands convicted, we will address the issue on the merits. We will assume, as did the State in its response, that the Defendant takes issue with Sergeant Postiglione's trial testimony.

Sergeant Postiglione testified that, upon reopening the investigation into the victim's death, he reviewed Officer Monday's crime scene report and then obtained the latent lift card created by Officer Monday. Sergeant Postiglione explained that Officer Monday had documented on the latent lift card that the latent print had been lifted from inside the crime scene. Sergeant Postiglione went on to testify that the location of the latent fingerprint was important "because [] the location where the print was found couldn't easily be explained away as to someone who may have been working at the

- 28 -

house two weeks prior . . . ." The trial court did not admit Officer Monday's crime scene report or the latent lift card, which contained Officer Monday's notation that the print was lifted from the coffee cup.

In arguing that Officer Monday's statements are nontestimonial, the State relies upon a case from New York, which addressed this same issue. In <u>People v. Jackson</u>, 108 A.D.3d 1079, 1080 (N.Y. App. Div. July 5, 2013), the court held:

> Defendant further contends that his Sixth Amendment right to confront his accusers was violated by the admission in evidence of testimony concerning a latent fingerprint that was processed and photographed by a technician who did not testify at trial (*see generally Crawford v Washington*, 541 US 36, 50-54 [2004]). We reject that contention. The technician who processed and photographed the fingerprint did not compare the latent print to the fingerprints of defendant or any other suspect. Thus, the technician's findings were not testimonial because the latent fingerprint, "standing alone, shed[s] no light on the guilt of the accused in the absence of an expert's opinion that the [latent fingerprint] match[es] a known sample" (<u>see generally</u> <u>Williams v Illinois</u>, 567 US —, 132 S. Ct. 2221, 2243-2244 [2012]). Moreover, the analyst who determined that the latent print matched one of defendant's fingerprints in fact testified at trial and was available for cross-examination. Therefore, defendant's right to confront witnesses against him was not violated.

<u>Jackson</u>, 108 A.D.3d at 1080 (some citations omitted).

We believe the holding in <u>Jackson</u> is based upon sound reasoning, and we reach a similar conclusion in this case. Assuming that Sergeant Postiglione's testimony was tantamount to admitting Officer Monday's out-of-court statement that the latent print was lifted from the coffee cup, we do not believe that statement to be testimonial under <u>Williams</u> and <u>Dotson</u>. Officer Monday was acting under the direction of Detective Langston in taking prints from the coffee cup, and the Defendant was not a suspect at that time. Additionally, at the time he created the latent lift card, Officer Monday did not know whether the print collected from the coffee cup would ultimately prove to be relevant at trial. Thus, the primary purpose of the statement was not evidentiary, nor was it a targeted accusation or sufficiently formal in character. As in <u>Jackson</u>, Officer Monday's statements are not testimonial because the latent fingerprint, standing alone, sheds no light on the guilt of the Defendant in the absence of an expert's opinion that the latent fingerprint matched a known sample from the Defendant. Moreover, the expert who matched the latent print to the Defendant was cross-examined by the Defendant at trial. Sergeant Postiglione and Detective Langston were also available for cross-

- 29 -

examination about the area that constituted the crime scene and the basis for their testimony that the print was lifted from inside the crime scene.  Therefore, we conclude that Sergeant Postiglione's testimony did not violate the Defendant's right to confrontation, and the Defendant is not entitled to relief on this basis.

## C.  Defense Argument on Alternative Locations for the Latent Print

The Defendant avers that the trial court violated his right to present a defense when it prohibited the Defendant from arguing to the jury that his fingerprint could have been left somewhere other than on an item inside the crime scene due to the fact he had installed insulation in the victim's residence weeks before the murder.  The Defendant contends that the trial court's ruling amounted to a finding of fact that the latent print was lifted from the coffee cup and that this finding was based on inadmissible evidence.  He posits that the crime scene had not been preserved and that the State failed to establish a chain of custody.  The State asserts that the trial court's ruling did not unreasonably restrict the Defendant or prevent him from arguing his alternative theory to the jury.

"[C]losing argument for the defense is a basic element of the adversary factfinding process in a criminal trial."  Herring v. New York, 422 U.S. 853, 858 (1975).  The Supreme Court has expressly found that:

> closing argument serves to sharpen and clarify the issues for resolution by the trier of fact in a criminal case.  For it is only after all the evidence is in that counsel for the parties are in a position to present their respective versions of the case as a whole.  Only then can they argue the inferences to be drawn from all the testimony, and point out the weaknesses of their adversaries' positions.  And for the defense, closing argument is the last clear chance to persuade the trier of fact that there may be reasonable doubt of the defendant's guilt.

Id. at 862 (citation omitted).  While a defendant's counsel is permitted to argue all reasonable inferences from the evidence, the Supreme Court has recognized that

> [t]he presiding judge must be and is given great latitude in controlling the duration and limiting the scope of closing summations.  He may limit counsel to a reasonable time and may terminate argument when continuation would be repetitive or redundant.  He may ensure that argument does not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial.  In all these respects he must have broad discretion.

Id. at 862 (citation omitted).

In Tennessee, it is well-established that argument of counsel is a valuable privilege that should not be unduly restricted. State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978). Therefore, "our courts give wide latitude to counsel in arguing their position in a case to the jury, and the action of a trial judge in controlling arguments of counsel will not be reversed absent an abuse of discretion." Id. (citing Smith v. State, 527 S.W.2d 737 (Tenn. 1975)). The purpose of closing argument is to allow each side "to assist the jury in analyzing, evaluating, and applying the evidence" and "includes counsel's right to state his contention as to the conclusion that the jury should draw from the evidence." State v. Cleveland, 959 S.W.2d 548, 551 (Tenn. 1997) (quoting United States v. Garza, 608 F.2d 659 (5th Cir. 1979)) (internal quotation marks omitted). Closing argument "must be temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried." Russell v. State, 532 S.W.2d 268, 271 (Tenn. 1976).

As we have previously determined, the State established a sufficient chain of custody for the latent print. Moreover, we have also determined that the trial court may consider what the Defendant calls "inadmissible evidence" when ruling on preliminary questions. See Tenn. R. Evid. 104(a).

After ruling that the latent fingerprint was admissible and that the State could present evidence that the print was lifted from inside the crime scene, the trial court instructed the Defendant that he could not "argue to the jury that the print was found elsewhere." At a subsequent pretrial hearing, the trial court explained its order. The trial court stressed that it had "not heard the evidence on all of this" but that "[t]here is just not even circumstantial evidence to suggest that this fingerprint came [from] anywhere other than a limited area." When the Defendant complained that the court's order had restricted the location of the fingerprint to the bedroom, bathroom, and hallway, the court responded, "If there is evidence, competent evidence, admissible evidence, that the whole house was dusted, then that changes the order." The court reiterated, "I'm not trying to limit the defense's alternative theory, but it's got to be supported by evidence" and stated that it would not allow the Defendant to "argue something not fairly raised by the evidence."

Following our review, we conclude that the trial court did not abuse its discretion and did not undermine the Defendant's right to present a defense. The trial court's ruling prohibited the Defendant from arguing that his print was found in another location outside the crime scene without the Defendant's first introducing some evidence of this at trial. Nothing in the court's ruling prohibited the Defendant from cross-examining witnesses or calling witnesses to establish some foundation for his argument. In fact, the

- 31 -

Defendant acknowledges that he could have cross-examined the State's witnesses or called his own witnesses to testify about possible alternative locations of the latent print. The Defendant admits that the only reason he chose not to do so was that this would have opened the door for the State to introduce evidence that the print was lifted from the coffee cup, which was "the very testimony that [the Defendant] sought to exclude prior to trial." As noted by the State, the problem the Defendant faced was that there was no factual foundation for his argument. All of the proof pointed to the latent print as having been lifted from the coffee cup, which was found in the hallway outside the bathroom. The Defendant's own statement to police indicated that the only thing he touched inside the victim's home was the telephone, weeks before the murder. There was no testimony that the Defendant ever drank coffee in the victim's home while working there. Moreover, Ms. Crossland testified that the victim was "meticulous" about keeping a clean home and washing dishes.

Despite the trial court's order, the Defendant was able to argue an alternative theory as to the fingerprint to the jury. During closing argument, the Defendant argued at length that the crime scene was not properly preserved and that, due to the disagreement between detectives and lack of control of the crime scene, the coffee cup could have been moved from the kitchen to the hamper by a paramedic. The trial court's ruling, which compelled the Defendant to make strategic choices in his defense and to tailor his argument so that it was predicated on the evidence introduced at trial, did not infringe upon the Defendant's right to present a defense. This issue is without merit.

### D.  Failure to Grant a Mistrial

Next, the Defendant contends that the trial court erred by failing to grant a mistrial after Ms. Hooper twice mentioned that there were "several points on the cup," thereby violating the trial court's order that no reference should be made to the latent print having been lifted from the coffee cup. The State responds that the trial court did not abuse its discretion by denying a mistrial based upon Ms. Hooper's testimony.

The decision to grant a mistrial is within the sound discretion of the trial court and such decision will not be overturned absent an abuse of discretion. State v. Nash, 294 S.W.3d 541, 546 (Tenn. 2009); State v. Jones, 733 S.W.2d 517, 522 (Tenn. Crim. App. 1987). "[N]ormally, a mistrial should be declared only if there is a manifest necessity for such action." Nash, 294 S.W.3d at 546 (quoting State v. Saylor, 117 S.W.3d 239, 250-51 (Tenn. 2003)). The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred that precludes an impartial verdict. Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). The burden of establishing a "manifest necessity" lies with the appellant. State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). In evaluating whether a mistrial is warranted because

of inappropriate testimony presented to the jury, this court may consider: "(1) whether the State elicited the testimony, or whether it was unsolicited and unresponsive; (2) whether the trial court offered and gave a curative jury instruction; and (3) the relative strength or weakness of the State's proof." Nash, 294 S.W.3d at 547 (citing State v. Smith, 893 S.W.2d 908 (Tenn.1994)).

During the Defendant's cross-examination of Ms. Hooper, the Defendant provided the witness a copy of an email exchange between Ms. Hooper and Sergeant Postiglione. The following exchange then took place:

> The Defendant: No obviously maybe the . . . verification with having Ms. Adelmann do her blind test, that may not have been known in a [thirty]-minute window, but it appears that you felt confident enough to go ahead and share with [Sergeant] Postiglione in a fairly short period of time-
>
> Ms. Hooper: Well, you know, it was—he had asked me, I think he had said something, I think it was some reports that there were several points on the cup, but not enough to make a positive identification.
>
> The Defendant: Talking about the work that Ms. Mabry had done?
>
> Ms. Hooper: Right, because I think initially when [Sergeant Postiglione] asked about it, I may have told him that [Ms. Mabry's] report had said negative, and he came back in a string of e-mails and said something about according to two reports he had there were several points on the cup.

At this point, the prosecutor requested that the parties approach the bench. During a bench conference, this colloquy occurred between the parties and the court:

> The State: I mean, obviously, I made her aware of the Court's ruling, Judge, but I don't think she's totally focused on that because . . . she's never had this happen before where she can't talk about where it was lifted, so I don't know how to handle it, but I was hoping we could get away with it the first time, but the second time.

| The Defendant: | I wasn't anticipating, I was just trying to show times. |
|---|---|
| The State: | I know everybody's trying to act like it's not happening, but it is and I don't want it to happen again without us doing something about it, so. All we need to do is remind her . . . she's just not used to— |

. . .

| The Court: | How long did it take for you to complete your portion of the— |
|---|---|
| The Defendant: | It doesn't matter, I'm just going to move on. |

Following a lunch recess, the Defendant moved the trial court for a mistrial based upon Ms. Hooper's references to "the cup." The State pointed out that, during cross-examination, the Defendant had handed Ms. Hooper the emails which referenced the cup. The trial court found there was no manifest necessity for a mistrial. The trial court determined that, although the testimony was not responsive to the Defendant's questions, the comments were not intentional on the part of Ms. Hooper. The court then suggested several possible curative instructions it could provide to the jury and stated that it was "open to suggestions" from the Defendant as to any curative instruction the Defendant wanted given. In response, counsel for the Defendant stated, "Why don't we proceed with the proof and then we'll chew on those suggestions, I don't necessarily know if we have to have it right now anyway." Ultimately, the Defendant refused any curative instruction about the cup, reasoning "I would suggest no instruction is better at this point because I think it rings the bell again."

Following a careful review, we conclude that the trial court did not abuse its discretion when it denied the Defendant's request for a mistrial. First, we note that the State did not elicit Ms. Hooper's testimony about the cup; her references to the cup occurred during the Defendant's cross-examination after the Defendant provided the witness with a set of emails that referenced the cup repeatedly. The trial court found that, although unresponsive to the Defendant's question, Ms. Hooper's comments were unintentional. Moreover, as pointed out by the State, Ms. Hooper never specifically said "coffee cup," and the jury could have interpreted her comments about "several points on the cup" as technical jargon based upon the context of the cross-examination on the techniques of analyzing a fingerprint. In any event, the trial court offered to give a curative instruction to the jury on the issue, but the Defendant rejected the offer, believing the wiser course was not to bring the matter to the attention of the jurors.

Although such a decision is a perfectly legitimate trial decision, an accused is not entitled to relief when he "fails to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a); see State v. McPherson, 882 S.W.2d 365, 371 (Tenn. Crim. App. 1994). Finally, when considered in light of the other evidence at trial—including the Defendant's admission to Mr. Williams that he killed the victim—we cannot conclude that Ms. Hooper's brief references to the cup had an impact on the verdict. The Defendant is not entitled to relief.

## E. Failure to Preserve Evidence

The Defendant contends that the State lost or destroyed two "crucial pieces of physical evidence"—the coffee cup and the liquid contents from the coffee cup—which the Defendant could have had tested for DNA. The Defendant asserts that the State's mishandling of this evidence deprived him of his rights to due process and a fair trial as outlined in State v. Ferguson, 2 S.W.3d 912 (Tenn. 1999).

In Ferguson, our supreme court "explained that the loss or destruction of potentially exculpatory evidence may violate a defendant's right to a fair trial." State v. Merriman, 410 S.W.3d 779, 784 (Tenn. 2013) (citing Ferguson, 2 S.W.3d at 915-16). The court determined that the due process required under the Tennessee Constitution was broader than that required under the United States Constitution and rejected the "bad faith" analysis adopted by the United States Supreme Court in Arizona v. Youngblood, 488 U.S. 51, 58 (1988). Id. at 784-85. Instead, the court in Ferguson adopted a balancing approach where a trial court must determine "[w]hether a trial, conducted without the [lost or] destroyed evidence, would be fundamentally fair." Id. at 785 (quoting Ferguson, 2 S.W.3d at 914.) "[B]ad faith is but one of the factors to be considered in determining whether the lost or destroyed evidence will deprive a defendant of a fundamentally fair trial." Id.

When a defendant raises a Ferguson claim, a trial court must first "determine whether the State had a duty to preserve the evidence." Merriman, 410 S.W.3d at 785. "[T]he State's duty to preserve evidence is limited to constitutionally material evidence described as 'evidence that might be expected to play a significant role in the suspect's defense.'" Id. (quoting Ferguson, 2 S.W.3d at 917). To meet this constitutional materiality standard, "the evidence must potentially possess exculpatory value and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Id. (footnote omitted).

If the proof demonstrates the existence of a duty to preserve and further shows that the State has failed in that duty, a court must proceed with a balancing analysis involving consideration of the following factors:

- 35 -

1. The degree of negligence involved;

2. The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and

3. The sufficiency of the other evidence used at trial to support the conviction.

Ferguson, 2 S.W.3d at 917 (footnote omitted). The trial court is required to balance these factors to determine whether conducting a trial without the missing evidence would be fundamentally fair. Merriman, 410 S.W.3d at 785. "If the trial court concludes that a trial would be fundamentally unfair without the missing evidence, the trial court may then impose an appropriate remedy to protect the defendant's right to a fair trial, including, but not limited to, dismissing the charges or providing a jury instruction." Id.

This court applies a de novo standard of review to the trial court's decision concerning the fundamental fairness of a trial conducted without the missing evidence. Id. at 791. The trial court's findings of fact, however, are entitled to substantial deference on appeal and are conclusive unless the evidence preponderates against them. See id. (citing Tenn. R. App. P. 13(d); Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997)). We review the trial court's choice of remedy for a Ferguson violation under the abuse of discretion standard. Id.

Regarding the coffee cup, the trial court found that the coffee cup was not collected as evidence by investigators. The State argues that, because the evidence does not preponderate against the trial court's finding that the cup was never collected, no Ferguson violation occurred. Relying on this court's opinion in State v. Brock, 327 S.W.3d 645 (Tenn. Crim. App. 2009), the State contends that it had no duty to preserve the coffee cup because the item was never taken into evidence by police. In Brock, the defendant raised a Ferguson claim based upon the State's failure to collect fingerprint evidence and a bloody footprint on the carpet near the victim's body. Id. at 698. This court concluded that due process did not require the State to collect the evidence in question. Id. at 699. The court explained:

On the one hand, the State is not required to investigate cases in any particular way: "Due process does not require the police to conduct a particular type of investigation. Rather, the reliability of the evidence gathered by the police is tested in the crucible of a trial at which the defendant receives due process." Moreover, "[i]t is not the duty of this

- 36 -

Court to pass judgment regarding the investigative techniques used by law enforcement unless they violate specific statutory or constitutional mandates." Accordingly, when the police have not conducted a fingerprint analysis, there is typically no duty to preserve what is essentially nonexistent evidence.

Id. (quoting State v. Tony Best, No. E2007-00296-CCA-R3-CD, 2008 WL 4367529, at *13 (Tenn. Crim. App. Sept. 25, 2008), perm. app. denied (Tenn. Mar. 16, 2009)) (internal citations omitted).

First, we agree with the State that the evidence does not preponderate against the trial court's conclusion that the coffee cup was never collected. From our review of the record, it appears that the confusion arose when the handwritten property log was transcribed and entered into the police department's computer system in 1995. As noted previously, the handwritten log indicates that either "1-rug" or "1-mug" was collected. Although the computerized list contains an entry for a coffee mug, it does not list as evidence the rug or piece of carpet that was collected from the scene and had remained in evidence by the time of trial.

We further agree that this reasoning from Brock is particularly applicable to this case and determine that due process does not require the State to have collected the coffee cup. It is not the duty of this court to pass judgment on the investigative techniques used by law enforcement in 1979 based upon today's law enforcement standards. In 1979, the coffee cup itself possessed no apparent exculpatory value. It certainly would not have been known to contain potential DNA evidence, nor would investigators have reason to believe that the powder used to dust for prints had potential exculpatory value. Because the State did not have a duty to collect the coffee cup, there was no duty to preserve this evidence. See Brock, 327 S.W.3d at 699; Tony Best, 2008 WL 4367529, at *13-14.

Assuming, arguendo, that the coffee cup had been collected and the State had a duty to preserve the item, the Defendant would not be entitled to relief under the balancing analysis from Ferguson. Although some degree of negligence would attach to the loss of the coffee cup by police, there is nothing in the record to suggest bad faith. The trial court appropriately noted, "Unfortunately, it is not uncommon in cold cases that evidence may be lost or misplaced, particularly where, as here, the storage of evidence was moved to a new facility." Additionally, the significance of the coffee cup was the latent print it contained, and the print was lifted and preserved. Even if the coffee cup was later tested and found to contain the DNA of a third party, it would not explain the Defendant's fingerprint on the cup in the middle of the crime scene or the Defendant's

confession to the murder to Mr. Williams.  Thus, even if the coffee cup had been collected and lost, the Defendant would not be entitled to relief.

Turning to the liquid contents of the coffee cup, the trial court found that the liquid was collected by Officer Monday and placed in a jar and the State lost the liquid sample sometime after having it tested for sugar content.  Given that this testing showed that the coffee was not the victim's because it had sugar in it, the liquid had little apparent exculpatory value.  However, even assuming that the State had a duty to preserve the liquid, we agree with the trial court that a trial without the missing evidence would not be fundamentally unfair to the Defendant.  While there was certainly some negligence involved in the loss of the evidence, there is no suggestion of bad faith in the record.  Moreover, the significance of the liquid sample is minimal because Dr. Boos testified that she would not expect to find any usable DNA in a liquid sample and that she knew of no technology that would allow such testing.  There was more than sufficient additional evidence used at trial to support the Defendant's conviction.  In addition to the proof about the Defendant's fingerprint, Mr. Williams testified in detail regarding the Defendant's confession and included at least one detail—that the victim had been found in her bathtub—which had not been released to the public in 2012.  In any event, based upon the State's failure to preserve the liquid sample, the trial court prohibited the State from offering testimony that the coffee contained sugar.  We conclude that the trial court acted within its discretion in crafting such a remedy for the loss of the liquid contents.  The Defendant is not entitled to relief.

## F.  Victim's Out-of-Court Statements

The Defendant also asserts that the trial court erred by allowing Ms. Crossland to testify about the statements that the victim made about the Defendant shortly before her death.  The Defendant contends that the victim's statements—that she felt sorry for the Defendant, that the Defendant had a hard life, and that she wished she could help the Defendant—were inadmissible hearsay.  The State responds that the trial court properly allowed Ms. Crossland to testify about the victim's statement of mind as it related to the Defendant.  We agree with the State.

Our supreme court recently explained that the appellate standard of review for rulings on hearsay evidence has multiple layers:

Initially, the trial court must determine whether the statement is hearsay.  If the statement is hearsay, then the trial court must then determine whether the hearsay statement fits within one of the exceptions.  To answer these questions, the trial court may need to receive evidence and hear testimony.  When the trial court makes factual findings and credibility determinations

in the course of ruling on an evidentiary motion, these factual and credibility findings are binding on a reviewing court unless the evidence in the record preponderates against them. *State v. Gilley*, 297 S.W.3d at 759-61. Once the trial court has made its factual findings, the next questions—whether the facts prove that the statement (1) was hearsay and (2) fits under one of the exceptions to the hearsay rule—are questions of law subject to de novo review. *State v. Schiefelbein*, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); *Keisling v. Keisling*, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005).

Kendrick v. State, 454 S.W.3d 450, 479 (Tenn. 2015).

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). A "statement" is an oral or written assertion. Tenn. R. Evid. 801(a). In order to be an assertion, an utterance must "be offered with the intent to state that some factual proposition is true." State v. Land, 34 S.W.3d 516, 526 (Tenn. Crim. App. 2000). Generally, hearsay is inadmissible unless the statement falls under one of the exceptions to the hearsay rule. See Tenn. R. Evid. 802.

In this case, the trial court admitted the victim's statements about the Defendant under the state of mind exception that provides for the admission of a declarant's "then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)[.]" Tenn. R. Evid. 803(3). The Advisory Commission Comment following this exception explains that "[c]ombining the hearsay exception with relevancy principles, declarations of mental state will be admissible to prove mental state at issue or subsequent conduct consistent with that mental state," but that "only the declarant's conduct, not some third party's conduct, is provable by this hearsay exception." Id., Advisory Comm'n Comment.

In ruling on this issue, the trial court found that the victim's statements were relevant as they established the nature of the victim's relationship with the Defendant at the time of her murder and offered a possible explanation for the lack of forced entry into the victim's home. In State v. Trusty, 326 S.W.3d 582, 603 (Tenn. Crim. App. 2010), this court concluded that a victim's statements about her fear of the defendant, made close to the time of her death, were admissible under the state of mind exception to the hearsay rule and were relevant to show the victim's behavior at the time of her death. The court explained:

> Given the proof of the on-again, off-again nature of the victim's relationship with the defendant, we conclude that the statements she made

shortly before her death about her fear of the defendant were relevant and admissible under the state of mind exception to show not only her state of mind at the time she uttered the statements, *but also her probable mental state and behavior at the time of her death, including whether she would have been likely to initiate contact with the defendant or willingly accompany him in her vehicle.*

Id. (emphasis added).

As in Trusty, we believe that the admitted statements of the victim in this case suggest possible future conduct on the part of the victim as it relates to the Defendant. The statements establish that the victim was friendly with and cared about the Defendant and therefore likely would have allowed the Defendant into her home. Thus, the trial court did not abuse its discretion by admitting the victim's statements to prove the victim's future conduct. We disagree with the Defendant that the "real purpose" behind the admission of the victim's statements— that Mr. Freddie had had a hard life and that she wished she could help him—was to establish the Defendant's subsequent conduct and his motive for the murder. Any financial motive the Defendant may have had for the murder was established by testimony relating to the cash and jewelry that were stolen from the victim's residence not on the basis of the victim's comments.

Finally, the Defendant argues in one sentence that the admission of the victim's statements violated his constitutional right to confrontation. Because the Defendant has made only a conclusory statement and a mere cursory citation to authority, he has waived our consideration of this issue for failure to cite to adequate authority and present an adequate argument. See Tenn. Ct. Crim. App. R. 10(b).

### G. Prior Statement from Merrill Wise

We now turn to the Defendant's claim that the trial court violated his right to present a defense when it refused to allow the introduction of a prior written statement from Merrill Wise, the telephone repairman who entered the victim's residence with Ms. Crossland on the day of the murder. During a jury-out hearing on this issue, the Defendant introduced a copy of a signed, written statement given by Mr. Wise on January 29, 1979.[8] In the statement, Mr. Wise reported, "I looked in all the windows and did not see anything out of order. I went to the garage door and it was open. But there was a dog in the garage so I did not go in." Sergeant Postiglione testified that he found the written statement inside the investigative case file and interviewed Mr. Wise by telephone in

---

[8] The statement appears to have been witnessed by two other individuals. It was not clear from the proof at the hearing when Mr. Wise's statement came into the possession of investigators.

March 2012. Although Mr. Wise remembered the incident, he did not remember details. Sergeant Postiglione read Mr. Wise portions of the statement to refresh Mr. Wise's memory. He spoke to Mr. Wise about the victim's dog being inside the garage, but he did not ask about the portion of the statement that indicated the garage door was open. Mr. Wise acknowledged that a report had been done by representatives from the phone company but did not discuss whether he actually signed the statement. The Defendant also presented a copy of Mr. Wise's obituary to the trial court, which indicated he died in October 2012.

The trial court ruled that the written statement from Mr. Wise constituted inadmissible hearsay. Regarding the Defendant's claim that he was nonetheless entitled to introduce Mr. Wise's statement as part of his right to present a defense, the trial court found that the statement was not critical to the defense because the writing had "three to four different interpretations." The trial court explained further:

> [I]t doesn't give an alternative theory that can go anywhere. I mean, whether that door was locked or unlocked when he arrived doesn't tell us whether it was locked or unlocked when the perpetrator, whoever that may have been, arrived and entered the house. I just don't see, and that's the first step that it is critical, and I just don't see that. I would be more inclined if it was something that absolutely suggested that there was another perpetrator or something of that nature . . . .

On appeal, the Defendant argues that Mr. Wise's statement was reliable hearsay and the admission of the statement was critical to the defense because the statement would have rebutted the State's claim that the victim likely knew her assailant and let him into the home based upon the lack of forced entry. The State responds that the trial court properly excluded Mr. Wise's statement.

Exclusions of evidence may violate the Due Process Clause of the Fourteenth Amendment of the United States Constitution even if the exclusions comply with rules of evidence. State v. Flood, 219 S.W.3d 307, 316-19 (Tenn. 2007). Principles of due process require that a defendant in a criminal trial have the right to present a defense and to offer testimony. Id. (citing Chambers v. Mississippi, 410 U.S. 284, 294 (1973); State v. Brown, 29 S.W.3d 427, 431 (Tenn. 2000)). In Washington v. Texas, the United States Supreme Court stated:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an

accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

388 U.S. 14, 19 (1976).

The right to present witnesses, while of critical importance, is not absolute. Brown, 29 S.W.3d at 432 (quoting Chambers, 410 U.S at 295). "In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence . . . ." Chambers, 410 U.S. at 302. Rules of procedure and evidence are designed to assure fairness and reliability in the criminal trial process. Id. So long as the rules of procedure and evidence are not applied arbitrarily or disproportionately to defeat the purposes they are designed to serve, these rules do not violate a defendant's right to present a defense. Flood, 219 S.W.3d at 316 (citing United States v. Scheffer, 523 U.S. 303, 308 (1998)).

In determining whether the exclusion of evidence rises to the level of a constitutional violation, this court considers whether: (1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important. Brown, 29 S.W.3d at 433-34 (citing Chambers, 410 U.S. at 298-301). The facts of each case must be considered carefully to determine whether the constitutional right to present a defense has been violated by the exclusion of evidence. Id. at 433.

Upon review, we conclude that the exclusion of Mr. Wise's statement did not violate the Defendant's right to present a defense. Although the excluded statement may have some indicia of reliability, we agree with the trial court that the statement was not critical to the defense. First, we note that Mr. Wise's statement is open to varying interpretations. Mr. Wise said that he went to the garage door "and it was open." It is not clear from his statement if he meant only that the door was unlocked or if he meant that the door was standing open. The Defendant argues that Mr. Wise's statement was critical because it shows that the perpetrator entered the house through an unlocked door. However, even if the garage door was unlocked when Mr. Wise arrived at the victim's residence after the murder, this would not establish that the door was unlocked at the time the perpetrator arrived and entered the house. Moreover, Mr. Wise's statement that the door to the garage was unlocked after the murder is not inconsistent with Ms. Crossland's testimony that the victim kept her doors locked and must have let the assailant into the house. The victim could have unlocked the door to let someone she knew inside the house, and/or the perpetrator could have left the door unlocked when he fled the scene. Finally, Mr. Wise's statement is not exculpatory. It does not exclude the Defendant as

- 42 -

being the perpetrator nor does it explain the presence of the Defendant's fingerprint inside the crime scene or the Defendant's subsequent confession to Mr. Williams. For all of these reasons, the evidence was not critical to the defense.

Similarly, we conclude that the interest supporting the exclusion of hearsay evidence is sufficiently important. There are several risks involved in hearsay evidence, including that: (1) the declarant's sincerity cannot be assessed; (2) the trier of fact may find it hard to discover whether there was some ambiguity in the declarant's original statement; (3) the declarant's memory cannot be tested by cross-examination; and (4) the declarant's perception may have been faulty. Neil P. Cohen et al., Tennessee Law of Evidence, § 8.01[3][b] (6th ed. 2011). Each of these concerns is present in this case.

Our consideration of the Brown factors fails to show that the exclusion of Mr. Wise's statement rose to the level of a constitutional violation. Accordingly, the trial court did not err in excluding the evidence.

## H. Prosecutorial Misconduct

Next, the Defendant raises a claim of prosecutorial misconduct, contending that the prosecutor intentionally misstated facts during closing argument thereby violating his right to due process.

The trial court has wide discretion in controlling the course of arguments and will not be reversed absent an abuse of discretion. Terry v. State, 46 S.W.3d 147, 156 (Tenn. 2001). Closing argument by a prosecutor "is a valuable privilege that should not be unduly restricted." State v. Bane, 57 S.W.3d 411, 425 (Tenn. 2001). That said, Tennessee courts have recognized numerous prosecutorial arguments as improper. It is improper for a prosecutor to "engage in derogatory remarks, appeal to the prejudice of the jury, misstate the evidence, or make arguments not reasonably based on the evidence." State v. Bates, 804 S.W.2d 868, 881 (Tenn. 1991).

In State v. Goltz, 111 S.W.3d 1 (Tenn. Crim. App. 2003), this court listed "five general areas of prosecutorial misconduct" that can arise during closing argument:

(1) intentionally misleading or misstating the evidence;

(2) expressing a personal belief or opinion as to the truth or falsity of the evidence or defendant's guilt;

(3) making statements calculated to inflame the passions or prejudices of the jury;

- 43 -

(4) injecting broader issues than the guilt or innocence of the accused; and

(5) intentionally referring to or arguing facts outside the record that are not matters of common public knowledge.

Goltz,111 S.W.3d at 6.

"In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict." State v. Pulliam, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996). In Judge v. State, 539 S.W.2d 340 (Tenn. Crim. App. 1976), this court listed the following factors to be considered when determining whether the improper conduct of a prosecutor affected the verdict to the prejudice of the defendant: (1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the court and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case. Id. at 344.

The Defendant contends that, during the State's initial closing argument, the prosecutor stated as fact that all doors were closed and locked—in spite of the statement from Mr. Wise that "clearly demonstrated that the garage door was open." Specifically, the prosecutor argued:

> We know that [the victim] let her killer into the home, okay. We know that that's true. She knew the person. How do we know that? First of all, her daughter, Lynda Crossland, testified that the house would have been locked during the day when she comes home. So she would have had to let the person in through a locked door. There was no sign[] of forced entry. The front door wasn't broken, a lock wasn't broken, all the windows were still intact, they were locked from the inside because it was January and they wouldn't have had the windows open. There were storm windows, they would have both had to have been opened, the storm windows and the glass panes that were locked. There's no signs that any storm windows were damaged, any place on the exterior was forcibl[y] entered. So, the only way for the perpetrator to get in was if [the victim] let them in[.]

Our review of the record reveals that the Defendant did not object to the prosecutor's allegedly erroneous statement, and the State asserts on appeal that the Defendant waived this claim by failing to raise a contemporaneous objection. We agree.

- 44 -

It is well-settled that defense counsel is obligated to object contemporaneously whenever counsel deems the prosecution to be making improper argument. See State v. Jordan, 325 S.W.3d 1, 57 (Tenn. 2010). Making a contemporaneous objection gives the trial court an opportunity to assess and correct any errors at the trial level, such as issuing a curative instruction, if necessary. Id. The failure to object contemporaneously will typically result in waiver of the issue on appeal. Id. at 58; Tenn. R. App. P. 36(a) (providing that an appellate court need not grant relief where party failed to take reasonably available action to prevent or nullify an error). By failing to raise a contemporaneous objection, the Defendant waived our consideration of this claim, absent plain error.

The plain error doctrine states that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). Before this court will find plain error, the following conditions must be met:

> "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The presence of all five factors must be established by the record before this court will recognize the existence of plain error, and complete consideration of all the factors by the court is not necessary when it is clear from the record that at least one of the factors cannot be established. Id. at 283.

The Defendant has not shown that the prosecutor misstated the evidence from trial in the State's closing argument. Ms. Crossland specifically testified that, although her mother may have left an interior door leading to the garage unlocked while doing laundry, the victim always kept the doors to the outside of the house locked when she was at home alone. Ms. Crossland also testified that there were no signs of forced entry and no damage to any of the windows. Mr. Wise's statement that the door to the garage was unlocked is not inconsistent with Ms. Crossland's testimony that the victim kept her doors locked and must have let the assailant into the house. The victim could have unlocked a door to let someone she knew inside the house, and the perpetrator could have left the door unlocked when he fled the scene. Thus, the statement from Mr. Wise is entirely consistent with Ms. Crossland's testimony, as well as investigators' observations

that there was no forced entry into the home. The Defendant has not established that a clear and unequivocal rule of law was breached.

The Defendant also contends that the prosecutor misstated evidence by arguing that Ms. Crossland immediately knew the coffee cup on the hamper was out of place because Ms. Crossland was in shock following the discovery of her mother's body. Specifically, the prosecutor stated:

> How do we know positioning of the evidence. [Defense counsel] spent a long time in his summation to you saying, "How do we know that stuff wasn't moved[?] How do we know the coffee cup was on the hamper?"
>
> . . .
>
> [Ms.] Crossland told you exactly where everything was, right out of the box, "coffee cup was on the hamper, and I didn't know why." She's the first person inside the house. She described where the clothes were in the bedroom. She described to you where her mother's blouse was.

Following an objection from the Defendant, the prosecutor responded that it was his recollection of the proof. The trial court overruled the objection but immediately instructed the jury that arguments of counsel were not to be considered as evidence.

We conclude that the prosecutor did not intentionally misstate evidence. Ms. Crossland testified that her mother would never leave dirty dishes out and always kept a very clean home. Moreover, Ms. Crossland testified that, after she recovered her senses, she went through the house with Sergeant Touchstone and immediately saw that the coffee cup on the hamper was out of place. The prosecutor's argument was a reasonable inference from the proof. In any event, the trial court issued a curative instruction to the jury that the arguments of counsel were not to be considered as evidence, and the jury is presumed to have followed this instruction. See, e.g., State v. Banks, 271 S.W.3d 90, 137 (Tenn. 2008) (noting that juries are presumed to follow the trial court's curative instructions). The Defendant is not entitled to relief.

## I. Flight Instruction

The Defendant contends that the trial court erred when it instructed the jury on flight and denied the Defendant's special request for a modified flight instruction. The State responds that the trial court properly charged the jury on flight. We agree with the State.

- 46 -

The Defendant proposed the following special jury instruction on flight:

Ladies and gentlemen of the jury, you have heard circumstantial evidence that [the Defendant] voluntarily left the city of Nashville sometime in the weeks following January 29, 1979. You have also heard circumstantial evidence that [the Defendant] voluntarily returned to Nashville prior to March 8, 1979. Whether the evidence constitutes flight, the reasons for it, and any weight to be given to it are question for you to determine.

In denying the Defendant's request for the special instruction, the trial court found that the facts in evidence at the close of proof warranted a charge on flight and that it was not appropriate "to put in [the charge] that [the Defendant] voluntarily returned to Nashville particularly under the circumstances that may have caused him to come back to Nashville."

The trial court provided the jury with the pattern instruction for flight, as follows:

The flight of a person accused of a crime is a circumstance which, when considered with the other facts of the case, may justify an inference of guilt. Flight is the voluntary withdrawal of oneself for the purpose of evading arrest or prosecution for the crime charged. Whether the evidence presented proves beyond a reasonable doubt that [the Defendant] fled is a question for your determination.

The law makes no precise distinction as to the manner or method of flight; it may be open, or it may be a hurried or concealed departure, or it may be a concealment within the jurisdiction. However, it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown, to constitute flight.

If flight is proved, the fact of flight alone does not allow you to find the defendant guilty of the crime alleged. However, since flight by a defendant may be caused by a consciousness of guilt, you may consider the fact of flight, if flight is so proven, along with the other evidence when you decide the guilt or innocence of the defendant. On the other hand, an entirely innocent person may take flight and such flight may be explained by proof offered, or by the facts and circumstances of the case.

Whether there was flight by the defendant, the reasons for it, and the weight to be given to it, are questions for you to determine.

See 7 T.P.I.—Crim. 42.18 (18th ed. 2014).

Questions regarding the propriety of jury instructions are mixed questions of law and fact; thus, our standard of review is de novo with no presumption of correctness. State v. Rush, 50 S.W.3d 424, 427 (Tenn. 2001). In Tennessee, a defendant has a right to a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions. State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000) (citing State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990)). Additionally, trial courts have a duty to give "a complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing State v. Harbison, 704 S.W.2d 314, 319 (Tenn.1986)). A trial court need not grant a defendant's request for special instructions when the general jury charge is correct and complete. State v. Zirkle, 910 S.W.2d 874, 892 (Tenn. Crim. App. 1995) (citing State v. Blakely, 677 S.W.2d 12 (Tenn. Crim. App. 1983)).

Sufficient evidence exists to support a jury instruction on flight when there is evidence of "both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown." State v. Burns, 979 S.W.2d 276, 289-90 (Tenn. 1998) (internal quotation, emphasis, and citation omitted). The State can satisfy the subsequent hiding out, evasion, or concealment requirement by introducing evidence from which a jury might infer such action. State v. Terrance Wilks, No. W1999-00279-CCA-R3-CD, 1999 WL 1097832, at *4 (Tenn. Crim. App. Nov. 22, 1999) (citing State v. Payton, 782 S.W.2d 490 (Tenn. Crim. App. 1989); Rogers v. State, 455 S.W.2d 182, 186-87 (Tenn. Crim. App. 1970)).

The proof at trial established that, in the weeks following the murder, investigators searched for the Defendant at all known addresses, and the Defendant could not be found. Mr. Lambert testified that the Defendant disappeared around the time of the victim's murder, stating that the Defendant "just didn't come back to work one day." Moreover, the Defendant stipulated that he left the state and was in Mississippi at the beginning of March 1979. In our view, the evidence in this case supported the giving of the flight instruction.

The Defendant cites no case law that supports his argument that his special charge was warranted. Moreover, as pointed out by the State, the given charge effectively encompassed the requested special charge. The Defendant is not entitled to relief.

## J. Admissibility of Portions of the Defendant's Interview

We now turn to the Defendant's claim that the trial court erred when it allowed the State to introduce into evidence certain portions of the Defendant's police interview. Before trial, the Defendant moved the trial court to require the State to redact "unfairly prejudicial material" from the Defendant's recorded interviews with Sergeant Postiglione. Specifically, the Defendant asked the court to order the redaction of any mention of the Defendant's prior criminal record, his prior rape conviction from Tunica, Mississippi, any references to gang activity, and comments made by Sergeant Postiglione that the Defendant had no remorse or conscience. At a hearing on the Defendant's motion, the trial court agreed that references to the Defendant's being incarcerated should be redacted. The trial court stated that it would underline the specific portions that needed to be redacted on its copy of the transcript of the recording and then provide the ordered redactions to the parties. At trial, the redacted recording of Sergeant Postiglione's interview with the Defendant was played for the jury, and the jury was provided with a transcript that corresponds to the recording. The Defendant stated that he had "no objection" to the recording but that the transcript should be marked for identification only.[9]

The Defendant now claims that the following exchange should have been completely redacted:

[The Defendant]:     So why you asking me? You know. 'Cause I just came out of pri . . . And the only reason I was still here in Nashville because, people wouldn't accept me where I wanted to go in Jackson, Mississippi. And I went back to the case manager in CRC, and told them about it. And that's how they got me hooked up with this Opportunity House thing out here off Shelby on Boscobel.

Postiglione:     Um uh

[The Defendant]:     and that was the only reason I was still in Nashville.

Postiglione:     . . . and then a month, month and a half later . . .

[The Defendant]:     So that's how I ended still in Nashville.

---

[9] The trial court properly instructed the jury that only the actual recording was to be considered as evidence.

Postiglione:          Okay.

[The Defendant]:      [S]o they hooked me up with this Opportunity House. So, so when I was staying there, my case manager, Ruth, got me hooked up with Al.

Postiglione:          Did you work on this particular job or do you remember who they were?

[The Defendant]:      Just about everybody, uh, I think Eddie Cook[e], and another white guy we called Sticks, I think all of us still working for them.

Postiglione:          So they would hire you from labor source or where, where were the

[The Defendant]:      Nah uh.

Postiglione:          Just directly from

[The Defendant]:      Opportunity House.

Postiglione:          Directly to them

[The Defendant]:      Yeah, you know, I think this lady knew Al. And um, I think that's how they got it hooked up, you know.

The Defendant contends that, from these comments, the jury learned the Defendant was on parole and that the jury was then "left to speculate why [the Defendant] had been in prison" and "why Mississippi chose not to allow [the Defendant] to transfer his [parole] supervision." He asserts that the admission of these statements violated Rule 403 of the Tennessee Rules of Evidence, which provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice[.]" Tenn. R. Evid. 403.

The record does not contain a copy of the trial court's ordered redactions. Therefore, it is unclear if the trial court instructed the State to redact the challenged

portion of the recording.[10]  It is the duty of the appellant to prepare a record which conveys a fair, accurate and complete account of what transpired in the trial court with respect to the issues which form the basis of his appeal. Tenn. R. App. P. 24(b); State v. Bunch, 646 S.W.2d 158, 160 (Tenn. 1983).  When the record is incomplete, or does not contain the proceedings relevant to an issue, this court is precluded from considering the issue.  State v. Miller, 737 S.W.2d 556, 558 (Tenn. Crim. App. 1987).  Because the Defendant has failed to provide an adequate record, he has waived our consideration of this issue.

Waiver notwithstanding, the Defendant has failed to demonstrate that the admission of the statements violated Rule 403 or that any error more probably than not affected the judgment.  See Tenn. R. App. P. 36(b).  We cannot agree with the Defendant that the jury gleaned from the unredacted statements that he had been in prison, was on parole, and that another state would not allow the transfer of his parole supervision.  This issue is without merit.

### K.  Use of the Defendant's Prior Misdemeanor Theft Convictions as Impeachment

Finally, the Defendant asserts that the trial court abused its discretion when it ruled that the State could use the Defendant's prior misdemeanor theft convictions as impeachment evidence if the Defendant testified at trial and thereby violated his rights to due process and to present a defense.  The Defendant does not dispute that his prior theft convictions involve crimes of dishonesty.  Instead, he argues that the probative value of the theft convictions on his credibility did not outweigh the prejudicial effect the admission of the convictions would have had on the substantive issues at trial due to the similarity of the convictions to the larceny underlying the felony murder charge.  The State contends the trial court properly ruled that the Defendant's prior convictions for theft could be used to impeach him.

As an initial matter, the State first argues that the Defendant has waived consideration of this issue by failing to provide appropriate citations to the record in his brief and by failing to object to the use of his theft convictions as impeachment. Although the State correctly points out that the Defendant failed to provide citations to the record when discussing this issue in his brief, we note that the record was not supplemented with the transcript of the hearing on this issue until after the Defendant's brief was filed.  Moreover, we do not believe that, by focusing his argument on the

---

[10] Assuming that the trial court ordered this exchange to be redacted and that the State neglected to make the redaction, the Defendant waived the error by failing to object to the admission of the recording and use of the transcript. See Tenn. R. App. P. 36(a); State v. Robinson, 146 S.W.3d 469, 518-19 (Tenn. 2004).

- 51 -

robbery conviction at the hearing, the Defendant intended to abandon his prior objection to the State's use of any of his prior convictions as impeachment. Consequently, the court will address the issue.

We review a trial court's ruling on the admissibility of prior convictions for impeachment purposes under an abuse of discretion standard. State v. Waller, 118 S.W.3d 368, (Tenn. 2003) (citing State v. Mixon, 983 S.W.2d 661, 675 (Tenn. 1999); State v. Blanton, 926 S.W.2d 953, 960 (Tenn. Crim. App. 1996)). A trial court abuses its discretion only when it "'applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining.'" State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999) (quoting State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997)).

Rule 609(a) of the Tennessee Rules of Evidence provides:

For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime may be admitted if the following procedures and conditions are satisfied:

(1) The witness must be asked about the conviction on cross-examination. If the witness denies having been convicted, the conviction may be established by public record. If the witness denies being the person named in the public record, identity may be established by other evidence.

(2) The crime must be punishable by death or imprisonment in excess of one year under the law under which the witness was convicted or, if not so punishable, the crime must have involved dishonesty or false statement.

(3) If the witness to be impeached is the accused in a criminal prosecution, the State must give the accused reasonable written notice of the impeaching conviction before trial, and the court upon request must determine that the conviction's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues. The court may rule on the admissibility of such proof prior to the trial but in any event shall rule prior to the testimony of the accused. If the court makes a final determination that such proof is admissible for impeachment purposes, the accused need not actually testify at the trial to later challenge the propriety of the determination.

Tenn. R. Evid. 906(a).

"The mere fact a prior conviction of the accused is identical or similar in nature to the offense for which the accused is being tried does not, as a matter of law, bar the use of the conviction to impeach the accused as a witness." State v. Baker, 956 S.W.2d 8, 15 (Tenn. Crim. App. 1997) (citing State v. Miller, 737 S.W.2d 556, 560 (Tenn. Crim. App. 1987)). Two criteria are especially relevant in determining whether the probative value of a conviction on the issue of credibility outweighs its unfair prejudicial effect upon the substantive issues: (1) the impeaching conviction's relevance as to credibility; and (2) the impeaching conviction's similarity to the charged offense. State v. Mixon, 983 S.W.2d 661, 674 (Tenn. 1999).

In this case, the trial court properly concluded that the probative value of the Defendant's prior theft convictions significantly outweighed any similarity to the charged offense. This court has previously held that theft is a crime of dishonesty and, therefore, "highly probative of credibility." See Baker, 956 S.W.2d at 15. Although there are similarities between the offenses of theft and larceny,[11] the Defendant's impeaching convictions for misdemeanor theft are not so similar to the charged offense of first degree felony murder that their probative value on credibility is outweighed by prejudicial effect. Thus, we conclude that the trial court did not abuse its discretion by permitting the use of the Defendant's prior theft convictions as impeachment evidence.

## Conclusion

In consideration of the foregoing and the record as a whole, the Defendant's convictions are affirmed, and the case is remanded for correction of the judgment forms. The judgment in Count One should state that the Defendant was convicted of the lesser-included offense of second degree murder, but it should not impose a conviction or a sentence and should note the merger of Count One into the conviction in Count Two. The judgment for Count Two should reflect that the Defendant was convicted of first degree felony murder and sentenced to life and that the second degree murder verdict in Count One merges into Count Two.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

---

[11] Larceny is defined as the "felonious taking and carrying away the personal goods of another . . ." Wright v. State, 549 S.W.2d 682, 684 (Tenn. 1977) (quoting Tenn. Code Ann. §39-4202).